SUMNER CHENEY *vs.* LORING W. GLEASON & others.

Middlesex.   Jan. 22. — June 26, 1877.   MORTON, ENDICOTT & SOULE, JJ., absent.
          Jan. 18. — July 24, 1878.   COLT & ENDICOTT, JJ., absent.

Where the owner of a parcel of land employs a broker to sell it for him, and the broker, by fraudulent representations respecting the value of another parcel of land, induces him to make a conveyance of his land to a third person, also a party to the fraud, and to take in exchange the parcel concerning which the representations were made, and the third person conveys the land to a purchaser in good faith, and takes a mortgage to secure a part of the purchase money, a bill in equity by the person so wronged, in which he seeks to obtain an assignment of the mortgage, and restitution in damages, is not, under the Gen. Sts. c. 127, § 1, terminated by the death of the plaintiff; and, under the St. of 1865, c. 42, his executor may be admitted to prosecute on motion, without a bill of revivor.

A bill in equity by A. against B., C., D. and E., alleged that, by the false and fraudulent representations of B., a real-estate broker employed by A. to sell his estate for him, A. was induced to make a deed of his land to C., and to take in exchange a worthless equity of redemption in a lot of land owned by D. ; that C. and D. were parties to the fraud ; that A.'s land was afterwards conveyed to E., a purchaser in good faith, who gave a mortgage back to C. for part of the purchase money.   The bill prayed for the assignment of this mortgage to A., for restitution in damages, and for general relief.   On issues framed to a jury, there was evidence that B., employed as alleged, and who was also employed by D. to sell his estate, fraudulently misrepresented the value and annual rental of D.'s estate, the character of the house thereon and the neighborhood, and the fact that a responsible person was in want of the place for a hotel; and that A. was thereby induced to make a deed of his land to C., and to take a deed of D.'s land at a much larger price than it was in fact worth ; that, while the transaction was pending, C. came with B. to see A.'s place, and B. and C. talked together most of the time; that

after the deeds were passed, C said that he bought A.'s place through B., and that the understanding was that, when B. found a good chance to trade, he was to let C. know; that D. afterwards admitted that he only received a portion of the difference in price between the valuation of his estate, as expressed in the deed, and that of A.'s estate. The defendants put in no evidence. *Held,* that the evidence was sufficient to warrant a finding in favor of the plaintiff against the defendants B., C. and D.; that the maxim *caveat emptor,* as applied by courts of law to affirmations between a buyer and seller respecting land, did not apply; that as the plaintiff did not seek to rescind, and could not rescind, the entire contract, on account of the sale of his land to a purchaser in good faith, evidence of a settlement with D. for an alleged incumbrance on D.'s land was immaterial. *Held, also,* that a request for an instruction that there was no ground for presumption against the defendants from the fact that they produced no witnesses, was properly refused. *Held, also,* that, on the question of fraud, evidence of the value of the estates and of the accompanying circumstances was admissible.

A decree in equity was entered by a single justice of this court, ordering that one of the defendants should forthwith convey to the plaintiff a certain mortgage and a note secured thereby; that the case should then be referred to a master, to ascertain the amount of damages suffered by the plaintiff, after deducting the value of the mortgage assigned to the plaintiff; and that the defendants should pay the plaintiff the amount of damages, together with the costs of suit, to be taxed by the master. From this decree the defendants appealed, and, pending the appeal, the master proceeded to assess the damages. *Held,* that the merits of the case were not open on the appeal; that the decree was not a final decree, and that the appeal therefrom did not work a stay of proceedings; that the direction that the master should tax the costs was erroneous; and that on the defendant's not producing and assigning the mortgage, the master was justified in assessing damages, without regard to the value of the mortgage.

A suit in equity by A. against B., C. and D. was referred to a master to assess the damages sustained, through the fraud of the defendants, by A., in being induced to sell to one of them a parcel of land, and to take in payment an equity of redemption in a parcel of land owned by D. The master made up the account by charging the defendants with the value of A.'s land, and deducting therefrom the amounts received by A. from rents, and a small sum received from a sale of D.'s estate by a mortgagee, after paying the mortgage. The master refused to deduct the value of a watch given by D. to A. in satisfaction of an incumbrance existing on the estate at the time of the sale, which he covenanted against. *Held,* that the deed of D.'s estate and of A.'s estate were properly admitted in evidence; that evidence, offered by the defendants, of the value of D.'s estate was immaterial; and that the value of the watch should have been deducted from A.'s damages.

BILL IN EQUITY, inserted in an original writ of summons and attachment, dated July 16, 1872, against Loring W. Gleason, Kiles P. Gleason, Henry Pearson and Sarah N. Charlebois, alleging that a deed was procured from the plaintiff, conveying a parcel of land in Reading to the defendant Kiles P., by means of the false and fraudulent representations of the defendant Loring W., a real-estate broker employed by the plaintiff to sell

the same for him on commission; and that the plaintiff was in-
duced by such false and fraudulent representations to take in
exchange a worthless equity of redemption in a lot of land in
Boston belonging to Pearson; that Kiles P. and Pearson were
parties to the fraud; and that the land in Reading was after-
wards conveyed to the defendant Charlebois, who purchased the
same in good faith, without knowledge of the fraud, and gave a
mortgage back to Kiles P., which he now holds, to secure part
of the purchase money. The bill prayed that the defendants
might be restrained from transferring this mortgage to any other
person, and might be required to assign it to the plaintiff, make
restitution in damages, and for general relief.

The defendants severally filed answers denying fraud, and con-
taining demurrers on the ground that the plaintiff had a plain
and adequate remedy at law. The answer of the defendant
Pearson also alleged that Pearson, two or three weeks before the
sale to the plaintiff, agreed to sell his equity of redemption in
the lot of land in Boston to Kiles P. Gleason, for $3000; that
this sum was all he received for the conveyance, which was made
to the plaintiff, at the request of Kiles P.; that, at the time, he
supposed the estate was free from incumbrances, except certain
mortgages; that afterwards, being informed that there was an
outstanding lease, he paid the plaintiff $50 in money and a gold
watch in full settlement of any claim he had or might have by
virtue of the covenants in the deed to the plaintiff.

After the decision overruling the demurrers, reported 117
Mass. 557, the case was tried, before *Wells*, J., on the following
issues to the jury:

"1. Was there an agreement or understanding between the
defendant L. W. Gleason and the defendant K. P. Gleason, by
which the said L. W. Gleason was to be interested in the prop-
erty which he was employed to sell, or in the proceeds or profits
of the sale or exchange of property, or to be in any way bene-
fited or compensated for his part in the transaction, otherwise
than by his commission as a broker?

"2. Did the defendant Pearson have any interest in, or know
of, or participate in, that arrangement, or in carrying it out?

"3. Was the plaintiff induced to make the exchange of estates
by false representations and deceit on the part of L. W. Glea-
son?

" 4. Did K. P. Gleason participate in the fraud and deceit practised upon the plaintiff ?

" 5. Did K. P. Gleason have notice, when he received the deed from the plaintiff, that the same had been procured by means of false representations ?

" 6. Did Henry Pearson participate in, or know of, said false representations?

" 7. Has the plaintiff settled with said Pearson for the incumbrance of the land, and discharged all claim on account thereof ? "

The jury answered all these issues in the affirmative, except the last, which they answered in the negative. The defendants alleged exceptions, which were duly filed and presented to the judge, who died before allowing them. By consent of parties, *Morton*, J., reported the case, in substance as follows, for the consideration of the full court, the parties agreeing that the re port was correct :

The plaintiff testified as follows : " My estate in Reading consisted of seven acres of land, with a house and stable upon it, and a large grapery, and was worth $7000 in 1871. In June, 1871, I went to L. W. Gleason, and employed him as a real-estate broker to sell my estate, and agreed to pay him $250 as a commission. After this, L. W. Gleason said he had a good place in Boston to sell, and that, if I wanted to exchange, he would give me a good bargain; that the Boston place was worth $13,000, and would rent for $1500 a year ; that I could come into possession on October 20; that, after paying taxes, there would be $900 or $1000 clear. We went to Chickering Place in Boston, and Gleason showed me the house, but we did not go in, Gleason giving as a reason that the tenant was fractious, and he did not like to go in. Gleason stated that the mortgage on it was $6000. Before we went to Chickering Place, Kiles P. Gleason came with L. W. Gleason to my place in Reading; I had but little talk with them; they talked with themselves most all the time ; nothing was said about Kiles P. being a purchaser. I made a bargain the next day. I think L. W. Gleason said it was a trade, and I signed a $500 bond. I did not see K. P. Gleason before the deed was given. I gave the deed in L. W. Gleason's office. Pearson and L. W. Gleason were there. I

gave my deed to L. W. Gleason, and he gave me a deed of the house in Chickering Place. Nothing was said that day about a lease. Soon after, a lease was made to Nelson. I left the house in Gleason's hands to let. Right away after the bargain was made, before the deed was given, he said he would lease it, that Nelson was good responsible man, and would pay the rent monthly. It was let for $1500 a year. The lease is dated October 3. I never received any money on account of the lease. I received a watch about two years ago from L. W. Gleason. He said something about a lease of Graham; I think he said Pearson gave it. Soon after the deeds were passed, Gleason told me Graham had a lease. I asked him how much Graham was paying; he said $1000; that Graham got it under price through a friend. He took me one side, and said that the police had driven Graham out; that he kept some women there."

On cross-examination, he testified as follows: "It seems to me that we went into an adjoining house in Chickering Place, next to No. 6. Think Gleason told me it would rent for $1500; was well worth $13,000. Think I understood he gave it as his opinion. He said Nelson wanted it to run the two houses together. Don't think the lease was signed the same day as the deed. When I took the deed, the lease was all ready for me to sign. Nelson was not there. I found out about the Graham lease just before I was to come into possession (October 6). Saw L. W. Gleason; he wanted me to wait; said he would get Graham out. Gleason gave me a watch. I supposed it was about the lease. Gleason told me it was a good and respectable neighborhood; said No. 6 was kept for a boarding-house; that it was wanted for a hotel. The property was sold under mortgage on September 2, 1872. I attended the sale. It was sold again for informality in the first sale. I think L. W. Gleason offered to raise money to take up the mortgages for me, and he tried to induce me to raise money to redeem the property. I received $85, proceeds of the sale; receipt is dated September 2, 1872. Up to April, it was in Gleason's hands, and he collected rents at rate of $1000. I told Gleason I would put it in Proctor's hands. I cannot say whether the deed to Gleason was executed and delivered the same day. I think Gleason has the $500 bond. I saw Pearson but once. I supposed Kiles P. Glea-

son owned the Chickering Place property. Graham was in possession at the time the deed was given."

The plaintiff offered in evidence the following deeds : Pearson to Cheney, dated October 2, 1871, of Chickering Place estate, consideration $13,000 ; Cheney to K. P. Gleason, of estate in Reading, consideration $7000, dated October 3, 1871; K. P. Gleason to S. N. Charlebois, of same estate, consideration $7000, dated April 27, 1872 ; mortgage deed, Charlebois to K. P. Gleason for $3300, of same date.

Mrs. S. N. Charlebois testified as follows : " In 1872, I lived at Hyde Park. In the spring of that year, moved to Reading. Bought the Reading place of K. P. Gleason, through L. W. Gleason, for $7000. Gave the place in Hyde Park and a mortgage, to K. P. Gleason for $3300. [This evidence was admitted under the defendants' objection.] The deeds were passed in L. W. Gleason's office. K. P. Gleason was not present. My deed of the Hyde Park property ran to L. W. Gleason, who did all the talking and made the trade. I did not know that the deed was to run to L. W. Gleason till deeds were passed. My husband questioned the conveyance to L. W. Gleason; he said it would make no difference, as he had made a trade with K. P. Gleason. There was a mortgage on the Hyde Park house, and K. P. Gleason paid me $300, which made the mortgages even. L. W. and K. P. Gleason came together to see the Hyde Park property."

The plaintiff offered in evidence a deed from S. N. Charlebois to L. W. Gleason, of the Hyde Park estate, consideration $8000, subject to a mortgage of $3000, dated April 27, 1872, which was admitted under the defendants' objection.

William Proctor, a real-estate agent, testified as follows : " I was acquainted with the Reading estate. In October, 1871, it was worth $7000. In April or May, 1872, Cheney came to me about the Chickering Place estate, and I applied to L. W. Gleason for the key, and endeavored to let the house, and could not. I asked Gleason what the house was let for ; he said for a house of ill-fame, and could not be let for any other purpose. I afterwards found it to be so. I told him the property was not such as Cheney could hold, as he could not let it for a lawful purpose, and was of no value to him. I told Gleason he did wrong to sell it to such people ; he only made a vague reply. I asked if

Cheney knew of it; he said ' No.' I never went into the house until the mortgagee's sale. I learned the character of the house, it was notorious. Gleason said the police had closed it up. I was present at mortgagee's sale. Defendant Pearson and a friend of his were there, and ten others. I made no attempt to sell the estate after learning its character. Think it was worth a few hundred dollars above the mortgage. It would be hard to get $6000 at forced sale." There was also other evidence that, in 1871, the house in Chickering Place was worth from $5600 to $7000; that it was used as a house of ill-fame, and that all the houses in the place were used for the same purpose.

Solon Bancroft testified as follows : " The plaintiff came to me in April or May, 1872, to consult me, and, in consequence, I had interviews with Pearson and K. P. Gleason. Pearson told me that he received for the Chickering Place house $3000 above the mortgage ; that L. W. Gleason sold it as his agent; that it had been used as a bed house. Kiles P. Gleason said he bought the Reading place through L. W. Gleason. The understanding was that when L. W. Gleason found a good chance to trade, he was to let him know. I made an offer to reconvey the Chickering Place estate to Pearson. Do not remember having deed. After the mortgage sale, Kingsbury brought me an account showing the balance."

Upon the plaintiff resting his case, the defendants offered no evidence, and asked the judge to rule that the plaintiff had shown no cause of action, and that the jury would not be warranted in finding for the plaintiff upon the issues. The judge declined so to rule, and submitted the issues to the jury.

The defendant Pearson requested the judge to rule, as especially applicable to his case, as follows :

" 1. There is no evidence competent to show that Pearson had any interest in, or knew of, or participated in, the alleged fraudulent representations; and the answer to the second question to the jury should be in the negative. 2. There is no evidence competent to show that Pearson participated in, or knew of, such false representations; and the answer to the sixth question to the jury should be in the negative. 3. The evidence shows that the plaintiff settled with Pearson for the incumbrance of the lease, and discharged all claim on account thereof; and the

answer to the seventh question should be in the affirmative. 4. The plaintiff waived his claim against Pearson for the breach of the covenant in his deed on account of the existence of the lease, by his recognition of the tenant under the lease. 5. The plaintiff was guilty of negligence in the management of the Chickering Place house, in allowing it to be sold without making proper effort to redeem it, and the defendant Pearson is released thereby from any liability on account of his covenant in his deed relating to his lease. 6. The plaintiff did not make sufficient offer for the return of the Chickering Place house to enable him to rescind the sale, and cannot maintain the bill. 7. The insertion of $13,000 as the consideration is not evidence of the actual consideration, and is not evidence in itself from which the jury have a right to infer fraud. 8. The fact that the plaintiff had completed his bargain with Kiles P. Gleason, and had executed his deed before Pearson made his deed, and before the plaintiff saw Pearson's deed, is evidence that the plaintiff was not induced to trade by the insertion of the consideration of $13,000 in the deed. 9. There is no evidence that the plaintiff was influenced or induced by the consideration named in the deed from Pearson, to make his deed to Kiles P. Gleason. 10. The receipt by the plaintiff of the balance of the sale of the Chickering Place house, without offering to pay the money to Pearson, is a waiver of his claim against him."

The defendants also requested the judge to instruct the jury that the fact that the defendants rested their case and put on no witnesses was no ground for any presumption against them.

The judge refused to give the first, second, third, fourth and fifth prayers for instruction, in the language in which they were asked, but instructed the jury that the interest, knowledge and participation of Pearson, in the alleged fraudulent representations, were for the jury to consider and pass upon, on all the evidence in the case; and the judge instructed the jury fully thereon; and submitted the question of settlement with Pearson to the jury, with full instructions thereon, as also the subject matter contained in the fourth and fifth requests; refused to give the sixth and tenth requests, as not applicable to the issues being tried. The seventh request was given with qualifications; and the eighth and ninth requests were given. The defendants alleged exceptions.

After the above report was made, the plaintiff died, and his executor was allowed by the court to come in on motion and prosecute. From this order, the defendants appealed.

*A. Cottrell*, for L. W. Gleason.

*A. A. Ranney*, for K. P. Gleason.

*C. S. Lincoln*, for Pearson.

*T. H. Sweetser & S. Bancroft*, for the plaintiff.

COLT, J. The defendants contend that the motion of the executor that he be allowed to prosecute the suit was improperly allowed, on the ground that the action did not survive at common law or under the provisions of the Gen. Sts. *c.* 127, § 1. But this is not an action to recover damages for a simple fraud practised upon the testator, by which he was induced to part with his property at less than its value. It is a suit to recover in equity specific property, or the avails of specific property, still held by one or more of the defendants, parties to the original fraud, and which was obtained from the plaintiff in the abuse of a trust arising out of an existing confidential relation between him and one of the defendants, as well as damages for the breach of the trust. The liability of a trustee in equity for a breach of duty causing damage is not terminated by the death of the party wronged. The case of *Leggate* v. *Moulton*, 115 Mass. 552, cited by the defendants, was an action at law to recover damages for false representations relating to the pecuniary ability of a third person, whereby the plaintiff was induced to part with real estate. It was held that such an action did not survive under the statute. This case is to be distinguished on the grounds stated, and the executor was here properly admitted to come in and prosecute the suit, and under the recent statute to come in on motion without bringing a bill of revivor. St. 1865, *c.* 42. *Pingree* v. *Coffin*, 12 Gray, 288, 317. *Sears* v. *Carrier*, 4 Allen, 339. *Walsham* v. *Stainton*, 1 De G., J. & S. 678.

It remains to dispose of the defendants' exceptions taken to the competency and sufficiency of the plaintiff's evidence. The defendants produced no evidence. In the opinion of the court, the evidence of the plaintiff, considering the nature of the facts to be proved, was sufficient to warrant the findings of the jury upon all the issues necessary to support a decree in his favor. As to the participation of the two Gleasons in the false repre-

sentations made to the plaintiff, and in the fraud by which one of them, while employed to sell a valuab.e estate for the plaintiff, was to share in the profits or proceeds of the sale to the other, there was proof of previous arrangements, private consultations, and an actual division of the proceeds of the transaction.

As to the participation of the defendant Pearson in the same fraud, there was evidence that he was present when the deed was passed; that he inserted a false consideration for his deed according to the valuation fixed by his agent, Gleason, for the purpose of the trade with the plaintiff; that he divided the profits with the other defendants; and, above all, that Gleason was acting as agent for him in disposing of the Chickering Place estate, for whose fraud, perpetrated while employed in the work of his agency, he, as principal, was legally responsible. *Commonwealth* v. *Mason*, 105 Mass. 163, 169.

As to the false representations employed, the evidence was, that Gleason, while occupying a fiduciary relation towards the plaintiff as agent to sell, which required him to exercise the highest good faith to secure the best terms for his employer, and while enjoying the confidence of the plaintiff incident to that relation, fraudulently misrepresented the value and annual rental of the Chickering Place estate, the character of the house and of the neighborhood, the fact that a responsible party was in want of the place for a hotel, and that the adjoining house was a boarding-house, and further that the plaintiff trusted these representations, and was induced to part with his estate in exchange for the estate described.

The defendants contend that the representations proved did not constitute a fraud nor warrant the submission of the question to the jury, because they were expressions of opinion and estimate only; and they cite the late case of *Parker* v. *Moulton*, 114 Mass. 99, with others of the same class, which were all cases of affirmations made between buyer and seller respecting the real estate of which the defendant was the seller. As between such parties, statements which concern the value of the land, or its condition or adaptation to particular uses, which are only matters of opinion and estimate, are not actionable. The maxim *caveat emptor* applies. The buyer is not excused from examina-

tion for himself unless he be fraudulently induced to forbear inquiries which he would otherwise have made. The parties to
the transaction are put on their guard; there is no breach of
confidence, no abuse of an express or implied trust between
them. The cases cited have no application to a suit in equity
brought to enforce a trust. They do not show that such representations, made by an agent to his principal, under the circumstances here disclosed, must not be treated as an actionable
wrong in a court of equity. It is said, indeed, that where this
relation exists, and there is any misrepresentation or concealment of a material fact, or any just suspicion of artifice or undue influence, courts of equity will interpose and pronounce the
transaction void, and as far as possible restore the parties to
their original rights. *Emery* v. *Parrott*, 107 Mass. 95. *Ormond*
v. *Hutchinson*, 13 Ves. 47, 51. *Beaumont* v. *Boultbee*, 5 Ves.
485. 1 Story Eq. Jur. § 218.

The question whether Pearson had been settled with by the
plaintiff for an alleged incumbrance on the land conveyed to
him, and whether the evidence warranted the finding, in the
view we take of the case, becomes immaterial. The plaintiff
cannot rescind the whole contract for the exchange of property.
The parties cannot be restored to their former condition, because
the plaintiff's original estate has passed into the hands of an
innocent party.

The foregoing considerations dispose of part of the objections
taken to the evidence admitted at the trial and to most of the
specific requests for instructions.

The request for the instruction that there was no ground for
presumption against the defendants from the fact that they produced no witnesses, could not be properly given. The neglect
of a party to produce evidence which is in his own power, is a
fact to be considered by the jury in connection with all the
other facts, and in a case of fraud, the parties to which are
within reach as witnesses, may be of great weight against him.
*Smith* v. *Whitman*, 6 Allen, 562, 564.

The court, we must presume, gave full instructions upon all
questions submitted. It does not appear that they were erroneous, or that the instructions requested should have been given,
except as they were given in full, or were modified by the judge

The evidence objected to nearly all related to the value of the estates which were exchanged. Upon the question of fraud, the actual relative value of the property exchanged had some bearing upon the motives and intentions of the parties. The plaintiff's testimony on this point was admissible. The dealings of Mrs. Charlebois with one of the Gleasons in the purchase of the plaintiff's estate from him, and the payment therefor, were admissible, as showing the value of the property and the relations of the two Gleasons to each other in the transaction. It does not appear that this evidence was objected to because the deeds referred to were not produced. The plaintiff's evidence which was objected to was all admissible on the question of fraud and as showing the accompanying circumstances. So was the lease from Pearson to Graham, which was unexpired at the time of the transaction. *Stebbins* v. *Miller*, 12 Allen, 591, 598.

*Decree to be entered for the plaintiff.*

On November 8, 1877, the following decree was entered: " The above case having been fully heard by the court, it is ordered, adjudged and decreed that the defendant Kiles P. Gleason do forthwith convey to the plaintiff's representative the mortgage described in the plaintiff's bill as given by the defendant Charlebois to the said K. P. Gleason ; also any and all other mortgages held by him upon the real estate described in said bill, and conveyed by said Cheney to the said K. P. Gleason ; also the promissory notes or other evidences of indebtedness which said mortgage or mortgages secure. And it is further ordered, adjudged and decreed that the case shall then be referred to Theodore C. Hurd, as master, who shall ascertain the amount of damages suffered by the plaintiff, after deducting the value of the mortgage or mortgages assigned by the said K. P. Gleason to the plaintiff, in accordance with this decree. And it is decreed that the defendants, Loring W. Gleason, Kiles P. Gleason and Henry Pearson, shall pay to the plaintiff the amount of damages so ascertained, together with the costs of suit to be taxed by said master."

On November 12, 1877, the defendants Kiles P. Gleason and Pearson appealed from this decree.

The master, notwithstanding the appeal, proceeded to hear the parties, and on December 12, 1877, made the following report:

" I find that the mortgages and notes which the defendant K. P. Gleason was directed, by the decree, to convey to the plaintiff's representatives, have not been so conveyed. I find the value of the estate in Reading, at the date of the conveyance alleged in the bill, to wit, October, 1871, to be $7000. I find that the defendants caused to be paid to the plaintiff the sum of $85 as the balance of proceeds of a mortgagee's sale of the estate in Boston, named in the bill.

" The defendant L. W. Gleason testified that he collected, for the plaintiff, the sum of $637, as rents of the Boston estate, and claimed to be entitled to have this sum deducted in estimating the damages. It appears that the defendant L. W. Gleason, from this sum, paid $225, as interest on the mortgages on the Boston estate, and retained the sum of $250 as his commission as a broker, for effecting the sale of the Reading estate. I disallow his claim to have these sums deducted, the case having found the whole of the transactions of sale fraudulent, and established his connection therewith. I find that he paid the plaintiff the balance of $637, to wit, $162.

" I ascertain the plaintiff's damages as follows :

" Value of Reading estate,                                     $7000.00
" Deduct amount received by the plaintiff,
    " Received from sale of Boston estate,   $85.00
        "        "    rents    "        "     162.00      247.00
                                                         6753.00
" Interest on said sum from July 16, 1872,               2185.71
                                                       $8938.71 "

The master also reported the objections taken by the defendants, at the hearing before him, and their exceptions, as follows :

" The defendants contended that the hearing should not proceed before the master pending their appeals from the decree of November 8, 1877. Against their objections, the hearing proceeded, the defendants excepting thereto.

" The plaintiff offered in evidence the deed of Pearson to Cheney, of the estate on Chickering Place, Boston. Against

the objection of the defendant K. P. Gleason, I admitted the deed, not for the purpose of showing the value of the Chickering Place property, but for the purpose of showing the consideration of the conveyance. To the admission of this deed the defendant K. P. Gleason excepted.

"The defendant Pearson offered evidence of the value of the Chickering Place estate in 1871. I refused to admit any evidence of the value of the Chickering Place estate, as the verdict, upon the issues submitted, and the decree had rendered it incompetent and immaterial. To this refusal the defendant Pearson excepted.

"The defendant K. P. Gleason testified that the Reading estate was worth less than $4000. After his cross-examination, upon the consideration of the conveyance of said estate by him to the defendant Charlebois, the plaintiff offered the record of the deed from K. P. Gleason to Charlebois. I admitted this record against his objection and exception.

"The defendant Pearson offered to prove that a watch worth $75 was given by him to the plaintiff Cheney, and contended that its value should be deducted and allowed in the assessment of damages. I ruled that the defendant Pearson was concluded by his answer, that this watch was given to Cheney as compensation for a lease which existed as an incumbrance on the Chickering Place property. To this refusal the defendant Pearson excepted."

The defendants Kiles P. Gleason and Pearson filed exceptions to the master's report substantially as above stated by the master, except the fifth exception of Kiles P. Gleason, which was as follows : " Because the master has not allowed for and deducted the value of the watch referred to in the report, as he was bound to do upon the facts found by him."

Hearing before *Endicott*, J., who overruled the defendants' exceptions, and, at the request of the defendants, reported the same for the consideration of the full court, to be heard with the appeal. If the court should be of opinion that the decree dated November 8, 1877, should be affirmed, and that the exceptions were properly overruled, a decree was to be entered for the plaintiff in the amount found by the master; otherwise, the case was to take such direction as the court might order.

*A. A. Ranney*, for K. P. Gleason.

*C. S. Lincoln*, for Pearson.

*T. H. Sweetser*, (*S. Bancroft* with him,) for the plaintiff.

MORTON, J. The appeal from the decree of November 8, 1877, does not open any questions upon the merits of the case. *Stanley* v. *Stark*, 115 Mass. 259. All such questions were heard and adjudicated at the former hearing. The decree in its substantial parts clearly follows the frame of the bill and is justified by the record. The only valid objection to it is found in the provision that the costs of suit are to be taxed by the master. This is an error, probably inadvertently committed by counsel in drawing the decree, and overlooked by the court, which may be corrected in the final decree.

After the decree was entered, the master proceeded to hear the parties upon the question of damages, and the defendants took several exceptions to his report.

1. The defendants contend that the master had no right to proceed, during the pendency of their appeal, on the ground that by the appeal all proceedings under the decree were to be stayed, under the Gen. Sts. c. 113, § 8. But we are of opinion that the decree was not a final decree, so that the appeal suspended the right of the court and the master to proceed to ascertain the damages sustained by the plaintiff. The decree does not determine the whole case. It contemplates that there is to be further action by the court through the master, and that another and final decree may be necessary in order to give the plaintiff the entire benefit of the decision. *Gerrish* v. *Black*, 109 Mass. 474. *Forbes* v. *Tuckerman*, 115 Mass. 115. The spirit and purpose of the decree was, that the hearing upon the question of damages should proceed at once, and the pendency of the appeal presented no obstacle to a full and fair hearing which would fix the amount of damages and thus render the case ready for a final decree upon the determination of the appeal. The defendants declined to produce and exhibit to the master the mortgages which they were required by the decree to assign, and he could not therefore follow the letter of the rule of reference and "ascertain the amount of damages suffered by the plaintiff, after deducting the value of the mortgage or mortgages assigned by the said K. P. Gleason to the plaintiff;" but he proceeded to

ascertain the value of the estate in Reading. The defendants were not injured by this proceeding. The value of the estate in Reading is the fundamental element of the damages in any aspect of the case. The parties had a full opportunity to be heard, and to set aside the report would be to observe mere technicalities at the expense of substantial justice. We are therefore of opinion that this exception should be overruled, and that the report should stand as the basis of the final decree to be entered in the case.

2. The exception to the admission of the deed of the Chickering Place estate cannot be sustained. It was the deed of one of the defendants, and tended to show the value which the parties placed upon the Reading estate. Though probably of very little weight, it was competent.

3. The evidence offered by the defendant Pearson, of the value of the Chickering Place estate, was rightly rejected. The record shows that this estate was sold under a mortgage, and that the plaintiff received eighty-five dollars therefrom, which the master has credited to the defendants in his report. The value of the estate was immaterial and incompetent.

4. The deed of the Reading estate, given by K. P. Gleason to Charlebois, had some tendency to show the value which he put upon the estate, and was therefore competent.

5. We are of opinion that the fifth exception of the defendant K. P. Gleason should be sustained. The watch transferred by the defendant Pearson to the plaintiff was property which the plaintiff received on account of the Chickering estate, and, like the rents received, diminishes the loss sustained by him.

The result is, that all the exceptions to the master's report are overruled except the fifth exception, which is sustained; but it is not necessary that, on this account, the case should be recommitted to the master, if the plaintiff will remit from the amount found by the master seventy-five dollars, being the value of the watch as claimed by the defendants.

Upon his so doing, a decree may be entered, the form and details to be settled before a single justice, affirming the former decree with the modifications above suggested, and with the further modification that if the mortgage or mortgages named in the former decree are not assigned to him within ten days, he

may at his election take a decree and execution against the defendants for the full amount due him, or may apply to the court for further decrees necessary to protect his rights.

*Decree accordingly.*