JOHN W. LUFKIN *vs.* CHARLES H. CUTTING, executor,
& another.

Suffolk. November 16, 1916. — January 12, 1917.

Present: RUGG, C. J., LORING, DE COURCY, CROSBY, & CARROLL, JJ.

*Equity Jurisdiction,* To relieve from fraud, Rescission, Laches. *Contract,* Rescission. *Sale,* Rescission. *Election. Equity Pleading and Practice,* Appeal, Amendment. *Survival of Action or Suit.*

In a suit in equity against the executor and a devisee under the will of one who had induced the plaintiff to exchange valuable real estate for shares of the capital stock of a certain corporation manufacturing vitrified bricks, owned by a confederate of the defendant's testator, by false representations as to the value of the property owned by the corporation, as to the extent of the business it was doing and the amount of profit it was making, as to an eagerness on the part of a banking house and other investors to purchase its capital stock, as to a number of large orders given to it for its manufactured product, and that the shares being sold to the plaintiff were treasury stock so that what he gave for them would go into the treasury of the corporation, it was *held* that findings of fact by a master to

whom the suit was referred showed that the false representations were assertions of material facts as distinguished from mere seller's or promoter's talk or expressions of opinion, and that the plaintiff was entitled to relief.

The facts that the plaintiff in the suit above described, after a visit to the plant of the corporation in a distant State eleven months after the transaction sought to be rescinded had taken place, had felt dissatisfaction with conditions as he found them and then continuously had asked the defendant's testator to reconvey his land to him in return for a retransfer of the shares of stock, that within sixteen months after the transaction he had purchased $5,000 worth of bonds of the corporation secured by a mortgage upon its property, the plan, which did not succeed, being to use the proceeds of the bond sale to pay off the indebtedness of the corporation, to secure the stockholders and to furnish funds to carry on the business, that a receiver of the corporation had been appointed two years and eight months after the transaction and that the plaintiff had not begun his suit against the defendant's testator until two years and one month thereafter and one year and seven months after the death of the defendants' testator, do not as a matter of law show an affirmation or ratification of the transaction by the plaintiff.

One, who by deceit had been induced to purchase shares of the capital stock of a corporation and who afterwards also purchased bonds of the corporation secured by a mortgage of its property, is not required, as a condition precedent to procuring a decree rescinding the purchase of the shares of stock in a suit in equity against the executor of the will of the person whose deceit had led him to make the purchase, to return or to offer to return the bonds.

Upon the allowance of an amendment changing an action at law into a suit in equity, the case must be treated as if originally commenced by a bill in equity.

A suit in equity to rescind a transaction whereby, through deceit, the plaintiff was induced to part with his property, may be maintained, after the death of the person who had perpetrated the fraud upon the plaintiff, against the executor of such person's will and one to whom he had devised the property which by such acts of fraud he had obtained from the plaintiff.

If, in eleven months after a sale, procured by fraud and deceit, of property in exchange for worthless shares of the capital stock of a corporation, the defrauded person began continuously seeking a rescission of the sale and the fraudulent person until his death three years and two months after the sale continually promised that such rescission would be effected, and if in the meantime a receiver of the corporation's property was appointed, a suit in equity for a rescission of the sale and a reconveyance of the property, begun one year and seven months after the death of the fraudulent person against the executor of his will and one to whom he had devised the property procured by the fraud, is not barred by laches.

BILL IN EQUITY, begun as an action of tort for deceit by a writ dated July 12, 1913, and afterwards amended into a bill in equity in the Superior Court, against the executor of and a devisee under the will of one Charles C. Moulton, seeking a rescission, by reason of fraud, of a contract between the plaintiff and Moulton whereby the plaintiff conveyed to Moulton and one Edwin F. Day certain real estate in Winchester in return for a transfer by Moulton to the

plaintiff of twenty thousand shares, and to his wife of five thousand shares of the capital stock of the Sherbrooke Gas and Vitrified Brick Company, a Maine corporation doing business in Kansas. Day afterwards conveyed his interest in the land to Moulton.

The suit was referred to a master. The material facts found by him and the exceptions of the defendants to his report are described in the opinion. The suit was reserved by *Fox,* J., upon the master's report and the exceptions thereto, for determination by this court.

*H. Parker,* for the defendants.

*J. E. Hannigan,* for the plaintiff.

CROSBY, J. This is a bill in equity brought against the executor of the will of Charles C. Moulton and also against one Mary B. Gates to rescind a contract entered into between the plaintiff and Moulton and to recover back a certain parcel of real estate in Winchester in this Commonwealth which was conveyed by the plaintiff to Moulton and one Day in exchange for the transfer to the plaintiff of twenty thousand shares of stock in the Sherbrooke Gas and Vitrified Brick Company.

The bill alleges that in November, 1908, the plaintiff was induced to enter into the contract by reason of certain false representations made by Moulton as to the value of the stock; that Moulton died on December 26, 1911, and the defendant Cutting has been duly appointed executor of his estate; that the defendant Gates claims title to the real estate as beneficiary under the will of Moulton, and that the defendant Cutting claims an interest in the real estate as such executor.

The defendants severally demurred to the bill and an interlocutory decree has been entered overruling the demurrers. The case was sent to a master who has filed his report. The defendants filed exceptions to five findings of fact made by the master and the case is before us upon a reservation, made by a judge of the Superior Court, upon the master's report and the exceptions thereto.

The following facts, among others, are found by the master: The plaintiff at the time of the hearing, in 1915, was apparently about seventy years of age; he had known Moulton since 1883 and respected and confided in him; from 1883 until April, 1907, they had not met; soon after the latter date the acquaintance was renewed and Moulton began to talk with the plaintiff about some

valuable property situated in the State of Kansas upon which, he stated, was located a brick, oil and natural gas plant; that in the fall of 1907, and thereafter, Moulton continually talked with the plaintiff about this property and said that he (Moulton) or they had a piece of property in Kansas that was going to develop into a large property; "That they had everything there to do with — -heating system, that is to say, oil wells to make heat — a superior quality of shale — and the plant — and the water — a good system of firing bricks — was right in the heart of a district where they used bricks — that they were especially good bricks — that they had numerous contracts for bricks, all the time. That they could produce them very cheap; cost $2 or $3 per thousand, and could get $12 or $15 per thousand and that some special brick were bringing more. That the city of Kansas was going to pave its streets or sidewalks with this vitrified brick. That he heard the company were getting more money and things were prospering right. That if they had more kilns, they would have a better chance, an unlimited chance of developing this property. That he would not deceive the plaintiff, and that the plaintiff was not running chances with him; that he knew he had a good piece of property; that Mr. E. F. Day had been there in charge of the works, and that he would tell as he, Moulton, had represented; that they had bought a large plant there, making similar bricks, and had increased their business; that the company was turning out well and he knew it would; that he wanted the plaintiff interested; that we could make a lot of money out of it; that they had a surplus in the treasury, and the directors had planned to pay a dividend of ten per cent January, 1909."

The master also made the following findings: that Moulton told the plaintiff that if he would buy the stock he (Moulton) knew the plaintiff would have a good income all his life and would get more than ten per cent; that Moulton told the plaintiff in substance that the property was making money; that the company was selling the bricks at a great profit, and was accumulating money all the time; that the gas works were equal to paying a dividend on the whole brick plant; that a little more money was needed for more kilns to carry on the business; and that it was proposed to raise it by selling treasury stock; that a large banking house on State Street, Boston, was selling the stock

rapidly; that it was going to increase in value; that a number of people on State Street were large investors in the stock; that he (Moulton) knew of these things because he was connected with the people who were in the company; that the company had a contract to build a State house in Kansas City, and had contracts with the United States, and large orders in different parts of the State of Kansas; that the bricks were being used in the streets and that there was an unlimited amount of shale and oil.

Many other findings are recited in the master's report of representations made by Moulton to the plaintiff.

He finds there was no evidence that the company had bought out any competing business or any other plant; that Moulton was acquainted with people who were interested in the property; that from the time the company began to make bricks in July, 1908, but a limited amount had been so manufactured or sold and that bricks enough to ensure a profit had not been sold; that in October, 1908, the company was selling very few bricks and had few contracts for such sale; that there was no available surplus in the treasury and the company was not accumulating money; that no vote had been passed to pay a dividend of ten per cent in January, 1909, and the company never had sufficient funds to pay such a dividend; that at the time the stock was transferred to the plaintiff, the company was doing business on borrowed capital and did not have sufficient assets to pay its debts; that the brick business at that time could not be carried on profitably; that the supply of oil and gas was not unlimited and the prospects of success were not good; that at that time (October, 1908) the stock of the company had no market value, but only a prospective value, and that it subsequently was found to be worthless; that the gas plant was not paying a dividend on the whole plant; that the company was not earning enough to pay its ordinary current expenses; that there was no evidence that any large banking concern on State Street, in Boston, had sold the stock or that people on State Street had invested in the stock of the company; and that there was no evidence that the company had large orders for bricks in different parts of Kansas or that there were ten or twelve oil wells on the property.

The master also finds that in the presence of Moulton certain statements were made to the plaintiff by Day, and by one Averill

who was a director of the company. These statements were in corroboration of those which Moulton had previously made to the plaintiff; that during the negotiations between the plaintiff and Moulton, which extended over a period of at least a year, both Day and Averill took an active part.

The master further finds that the plaintiff was induced by Moulton to believe that he was purchasing treasury stock and that the money so paid by him was to be used by the company; but that in fact, the greater part, if not all, of the stock transferred to him was stock of Day; that the bargain was completed in October, 1908, and the stock was transferred on or about November 19, 1908.

In return for the conveyance of the real estate which was made to Moulton and Day, the plaintiff received twenty-five thousand shares of stock of the company at the par value of $1 each, of which twenty thousand shares were placed in the name of the plaintiff, and five thousand shares were carried in the name of his wife. It appears that Day subsequently conveyed his interest in the real estate to Moulton in whose name the title stood at the date of his death.

The master finds that the plaintiff relying upon the foregoing representations was deceived thereby and was induced to and did convey to the said Moulton and Day his property as aforesaid, which was in value far in excess of any probable or possible value of the stock which he and his wife received, taking into account the existing and continuing conditions and circumstances herein set forth of the Sherbrooke Gas and Vitrified Brick Company; and that, at the time he received the stock, it was of no value.

It is plain upon these findings that the plaintiff was induced to part with his property as the result of the deception and false representations of Moulton. Many of these representations were assertions of material facts as distinguished from expressions of opinion or mere seller's or promoter's talk. *Whitney* v. *Lynch,* 222 Mass. 112. *Noyes* v. *Meharry,* 213 Mass. 598. *Ginn* v. *Almy,* 212 Mass. 486, 503. *Gurney* v. *Tenney,* 197 Mass. 457.

The master further found among other matters that the plaintiff is entitled to have the property in Winchester reconveyed to him, and in addition thereto should receive as damages the sum of $1,000 unless as matter of law the following facts prevent recovery.

When the plaintiff failed to receive any dividend in January, 1909, as had been promised, he asked Moulton when it would be paid. Moulton told him "not to worry as it would come right along, that the money was there; that they were building new kilns; and that the property was all right." The plaintiff visited the property in Kansas in September, 1909, and while not satisfied with the conditions in which he found it, did not at that time make any effort to obtain a return of the real estate which he had exchanged for the stock; but several times after such visit and before the death of Moulton in December, 1911, he spoke to the latter about the stock and complained that he had not received any dividends and asked Moulton to return to him the property and offered to return the twenty-five thousand shares of stock.

The conduct of the plaintiff after he had purchased the stock did not amount to an adoption or affirmation of the contract. No such contention appears to have ever been made by Moulton who repeatedly promised to reconvey the property, and the master finds that the plaintiff relied upon these promises. *Thomson* v. *Pentecost,* 206 Mass. 505. *Anastas* v. *Koliopoulos,* 222 Mass. 267.

The purchase by the plaintiff of bonds to the extent of $5,000 secured by a mortgage upon the property of the company in January, 1910,* was not an affirmation or ratification of the contract

---

* The master's findings as to these bonds were as follows: "Early in 1910 also a syndicate of stockholders, of which the plaintiff was one, was formed for the purpose of paying off pressing indebtedness of the company, securing their individual holdings, and running the plant. Under this syndicate arrangement, the subscribers were to subscribe ten per cent of their respective holdings in cash and receive bonds to that amount. Under this plan the plaintiff paid in $5,000 in cash, received bonds of the face value of $5,000, and has held them ever since. The plaintiff testified that he purchased these bonds, trying to protect the stock which he already had; and that, at the time he bought these bonds, the company gave him one hundred additional shares of stock. Upon the stock book no such issue of one hundred shares appears in the name of the plaintiff, but it does appear that in March, 1910, seven hundred and fifty shares and again in April, 1910, five hundred shares of stock were issued in the name of the plaintiff from shares of stock then standing in the name of C. A. French, the president of the company. These twelve hundred and fifty shares were issued on the old form of certificate setting forth the par value thereof at $1, but no further evidence was offered to explain the same."

for the purchase of the stock. It is found that the purpose of the loan was to pay off the indebtedness of the company, to secure the stockholders and to furnish funds to carry on the business. It appears that the plan did not succeed, but that in March, 1910, the business was at a standstill and so continued until a receiver was appointed in June, 1911.

The plaintiff was under no obligation to return or offer to return the bonds held by him as a condition precedent to the bringing of the bill. The purchase of the bonds was an entirely independent transaction in no way connected with the purchase of the stock.

The finding was warranted that it did not appear the shares had any market value in October, 1908. The facts reported by the master show that the shares had neither market value nor actual value, either in October of 1908 or in November, 1908, when the plaintiff received the stock. It follows that the defendants' first and fourth exceptions must be overruled.

The second exception, — to the finding that "the plaintiff was induced to believe that in this transaction he was purchasing treasury stock and that his money was to be used for and by the company," and the third exception, — to the finding "that many of these representations were false, that the plaintiff relying thereon was deceived thereby and was induced to and did convey to said Moulton and Day his property," cannot be sustained. The findings were fully warranted if the master believed the testimony of the plaintiff.

The fifth exception, — to the finding "that the plaintiff is entitled to have said property in Winchester reconveyed to him, and in addition thereto should receive as damages the sum of $1,000," must be overruled for the reasons already stated, unless as matter of law the plaintiff is precluded from recovery on the ground that he has no remedy in equity, or for the reason that his claim is barred by laches.

The defendants contend that this case was originally commenced by an action at law which, after demurrer, was, by amendment, changed into a bill in equity; and that the cause of action alleged in the bill did not survive the death of the defendant Cutting's intestate. R. L. c. 173, § 48.

The R. L. c. 173, § 121, provides that "The cause of action shall

be considered to be the same for which the action was brought, if the court finds that it is the cause of action relied on by the plaintiff when the action was commenced, however the same may be misdescribed; and the allowance by the court of an amendment shall be conclusive evidence of the identity of the cause of action."

The allowance of the amendment involved a finding of fact and is made conclusive of the identity of the demand set out in the bill with that which was described in the action as originally brought. Upon this record, the allowance of the amendment is conclusive and binding upon the parties. The case is to be treated as if originally commenced by a bill in equity. *Mann* v. *Brewer,* 7 Allen, 202. *Batchelder* v. *Pierce,* 170 Mass. 260. It is true, as contended by the defendants, that an action at common law or under the provisions of R. L. c. 171, § 1, will not survive for a fraud practiced upon a party. *Rockwell* v. *Furness,* 215 Mass. 557. *Cheney* v. *Gleason,* 125 Mass. 166, 174. *Leggate* v. *Moulton,* 115 Mass. 552.

The rule as to common law actions has no application to a case of this kind which is a suit in equity brought to rescind a contract alleged to have been procured by fraud and to recover specific property. That such a suit may be maintained after the death of the wrongdoer is well established. *Batty* v. *Greene,* 206 Mass. 561. *Parker* v. *Simpson,* 180 Mass. 334, 343. Perry on Trusts, § 166. The filing of the bill and service thereof upon the defendant is sufficient evidence of the election of the plaintiff to rescind. *Parker* v. *Simpson, ubi supra.*

The defence of laches is open to the defendants, at least under the fifth exception to the master's report. The evidence recited in connection with the master's findings shows that soon after the plaintiff learned of the fraud that had been practised upon him, he repeatedly requested Moulton to reconvey the real estate, and that Moulton never denied the plaintiff's right to such reconveyance but often promised to return the property. There was evidence and the master finds that such promises were so made up to a short time before Moulton's death and that the plaintiff at all times relied upon these promises and had reason to believe that Moulton would return the property.

It does not appear that the defendants have suffered any injury by reason of the delay or that the failure of the plaintiff sooner to

assert his rights has shown him to be guilty of laches. *Stewart* v. *Finkelstone,* 206 Mass. 28. *O'Shea* v. *Vaughn,* 201 Mass. 412. *Daly* v. *Foss,* 199 Mass. 104.

A decree is to be entered confirming the interlocutory decree overruling the demurrer, and overruling the exceptions to the master's report and confirming that report; also, directing that the contract be rescinded and that the defendants be ordered to reconvey the property to the plaintiff and to pay him the sum of $1,000 as damages, together with interest from the date of the filing of the master's report, with costs of suit.

*So ordered.*