JOSIAH H. JONES, appellant, *vs.* ODANATHUS SIMPSON.

Middlesex.   May 28, 1898. — June 23, 1898.

Present: FIELD, C. J., ALLEN, HOLMES, LATHROP, & BARKER, JJ.

*Will — Undue Influence.*

Where it appears that whether the contents of an alleged will were known to the testatrix and whether they expressed her intentions depend wholly upon the testimony of the son, in whose handwriting the instrument is and in whose interest it is mainly drawn, it having been executed without the knowledge of the rest of the family or a word of counsel from any one but himself, and when the testatrix was of advanced years, and where the court is unable to believe his account of the interviews between himself and his mother which resulted in the execution of the instrument, a decree affirming a decree of the Probate Court disallowing the instrument as the last will of the testatrix will not be disturbed.

APPEAL, by Josiah H. Jones, from a decree of *Holmes,* J., affirming a decree of the Probate Court disallowing an instrument propounded for admission to probate, on the petition of said Jones for a letter of administration with the will annexed, as the last will of Mrs. Elizabeth Simpson, who died on March 1, 1897, when ninety-five years of age.

The will, with the exception of the formal parts, is as follows:

" First.   I give and devise to my son Odanathus Simpson, his heirs and assigns, all the real estate of which I shall die seised, and I hereby direct that within thirty days after my decease my said son Odanathus or his heirs shall give a promissory note in the sum of twenty-five thousand dollars secured by mortgage upon such real estate as shall be good and ample security for the said sum, payable to John H. McAlvin of said Lowell, trustee.

" Second.   I give and bequeath to my son Verrazano Simpson, his heirs and assigns, all the rest and residue of my property, including money, bank books, stocks, bonds, and personal prop-

erty of every kind of which I shall die possessed, and I hereby direct that within sixty days after my decease my said son Verrazano or his heirs shall give a promissory note in the sum of twenty-five thousand dollars with good and sufficient security for the payment of said sum, payable to the said John H. McAlvin, trustee.

"The two notes of twenty-five thousand each payable to John H. McAlvin, trustee, are in trust for my son, Longinus Simpson, in case he shall appear in his own proper person within five years of the date of my decease.

"And in case the said Longinus Simpson shall so appear within the said term, I direct the said John H. McAlvin, trustee, to collect the said two notes and pay the proceeds of the same to the said Longinus Simpson, but in case the said Longinus Simpson shall not appear in his own proper person within the said term of five years from the date of my decease, I direct the said John H. McAlvin, trustee, at the termination of said term, to deliver up the said notes to their respective makers and to cancel and discharge any mortgage which may have been given to secure the said notes and to release any and all securities he may hold for the payment of the same, and my will is that unless the said Longinus Simpson appear in his own proper person within the said term of five years (after the date of my decease), neither he or any of his issue take any share of my estate.

"And I hereby nominate and appoint the said John H. McAlvin to be the executor of this my last will and testament."

The will was disallowed, on the ground that it was procured by the undue influence of Verrazano Simpson, and that was the only issue tried. The material facts appear in the opinion.

*W. H. Bent & L. H. Kileski*, for the appellant.

*L. T. Trull & F. N. Wier*, (*G. A. Sanderson* with them,) for the appellee.

BARKER, J. The evidence is reported to the full court, and the question for decision is whether upon the evidence the instrument should be admitted to probate.

We are of opinion that it should not. Mrs. Simpson was a widow whose husband had died testate in the year 1883, leaving an estate appraised at more than $400,000, from which she received as residuary legatee about $250,000 in personal property,

and about $123,000 in real estate. The instrument propounded for probate as her will was executed by her on October 1, 1884, when she was eighty-three years of age. She then had two sons, who were her next of kin and presumptive heirs. One of these sons was her confidential and trusted adviser, and the alleged will is in his handwriting, is mainly in his own interest and upon his own statement it was executed by his mother without the knowledge of the rest of the family or a word of counsel from any one but himself. These are circumstances of suspicion, calling for care in the court which has the duty of deciding whether the instrument shall be admitted to probate, and requiring the court "not to grant probate without entire satisfaction that the instrument does express the real intentions of the deceased." *Baldwin* v. *Parker*, 99 Mass. 79, 87. *Ogden* v. *Greenleaf*, 143 Mass. 349.

The evidence, so far from disclosing any clear and sufficient explanation of the transaction to satisfy us that the alleged will expresses the real intentions of Mrs. Simpson, leads us to the belief that its execution was procured by the undue influence of the son who wrote it, in pursuance of a plan formed by him shortly after his father's death, to get control of his mother's fortune.

The father died in April, 1883, and almost immediately thereafter the son desired to buy his mother's property at the price of $200,000. This sale was checked by the opposition of the other son, and in October, 1883, Mrs. Simpson gave to each son real estate and mortgages to the value of $40,000, leaving the value of her remaining real estate very much less than the value of her remaining personal property. This was the situation of her estate when the alleged will was executed, in October, 1884. Assuming, as we must, that the provisions concerning the third son, who had not been heard from since he went as a sailor forty years before, would require ultimately no part of Mrs. Simpson's estate, the operation of the alleged will would be to give to the son who drew the instrument, and who alone of the family knew of its execution or was acquainted with its contents, all of her personal property, and to the other son her real estate, giving to the former three or four times the amount given to the latter, and making every future change of Mrs. Simpson's property from realty to personalty operate to the further advan-

tage of the son in whose handwriting the instrument is drawn. The instrument was executed at the registry of probate, and there left upon deposit, and the register's receipt for it was not long after taken away by the son who had written the will, and was kept by him until after Mrs. Simpson's death.   Three years after the instrument was executed, he bought of his mother all her property, except the house in which she lived and a farm, for the price of $150,000, much less than it was worth, and gave her in payment only his own unsecured notes, which would come back to him under the alleged will.   Five years later, when Mrs. Simpson was ninety-one years of age, not having paid his notes as they matured, he made a final contract with her by which she gave up his notes upon his promise to pay her $550 a month until her death, and at her death these payments were largely represented by his unpaid notes in her possession.

Whether the contents of the alleged will were known to Mrs. Simpson, and whether they expressed her intentions, depend wholly upon the testimony of the son in whose handwriting the instrument is.   It is impossible for us to believe his account of the interviews between himself and Mrs. Simpson resulting in the execution of the instrument and, upon a careful study of the whole evidence, we are satisfied that the decree disallowing the instrument was right.*

*Decree affirmed.*

---

* Verrazano Simpson, who testified at great length, stated in substance, among other things, that his mother suggested the making of a will; that she said that she was dissatisfied with her husband's will because he had given his relatives something and her relatives nothing; that the reason why she wanted to make a will was in order that her relatives might have something; and that she then told him that she wanted to give the real estate to Odanathus and the personal property to him, Verrazano, and nothing was said about any relative.   He further testified that he thought at the time the will was made his mother had given away twenty or twenty-five thousand dollars to her relatives; that he had no talk with her as to the size of her estate or about the division between himself and Odanathus being equal; that he told her that she ought to make a will on account of the absence of her son, Longinus; that she made the suggestions as to certain changes when he copied the will from a draft prepared by a lawyer; that it was her suggestion that the note to be given by Odanathus should be secured on real estate; that he did not know whether it was her suggestion that the note to be given by him should be merely secured; and that his mother expressed dissatisfaction with the habits of Odanathus.