PERCY PARKER, administrator, & another *vs.* VERRAZANO SIMPSON.

Middlesex.    December 4, 1900. — January 4, 1902.

Present: HOLMES, C. J., KNOWLTON, LATHROP, HAMMOND, & LORING, JJ.

*Equity Pleading and Practice*, Demurrer, Parties, Multifariousness, Issues for jury, Master's report.    *Limitations*, *Statute of*, Fraudulent concealment.    *Contract*, Rescission.    *Action*, Survival.    *Constitutional Law*, Right to trial by jury in "controversies concerning property."    *Interest*.    *Damages*.    *Trust*, Implied.

Where a bill for relief prays for discovery a demurrer cannot be sustained on the ground that the plaintiff is not entitled to the discovery if the bill is sustainable for relief.

In a suit in equity seeking the rescission of a contract on the ground of fraud and undue influence, by which the defendant induced his mother to convey to him substantially all her property before her death, the plaintiffs were the administrator with the will annexed of the defendant's mother and the defendant's brother.    The mother by her will had left her property to be equally divided between the two brothers.    The contract sought to be rescinded included various conveyances and transfers of real and personal property which were all parts of the same transaction.    *Held*, that there was no misjoinder of plaintiffs; that it was proper that the persons entitled to the real estate and those entitled to the personal property both should be parties to the bill and bound by the result, so that the rights of all the parties might be adjusted in one suit.    *Held, also*, that there was nothing in the objection, that the administrator asked for

the proceeds of real estate sold by the defendant which would not lose its character by its conversion into cash by the fraudulent grantee, as the administrator when he received the proceeds would hold them in trust for the persons to whom the real estate if unsold would have gone. *Held, also,* that the bill was not multifarious, as it sought to set aside various contracts which were all parts of one entire scheme of alleged fraud in which all the parties were interested.

A fraudulent concealment of the cause of action operates none the less to take a suit in equity out of the statute of limitations because it was first known to the plaintiff after the filing of the bill.

There need be no previous notice of an election by the administrator of a party to a contract to rescind it, before filing a bill in equity praying for its rescission on the ground of fraud and undue influence, the transactions to be set aside covering a series of fraudulent transfers of property through an extended period. In such a case the filing of the bill and the service are sufficient notice.

A cause of action to rescind and set aside a contract procured by the fraud and undue influence of the defendant, by reason of which the defendant's mother conveyed to him substantially all her property to the exclusion of his brother who otherwise would have taken one half of it, is for damage done to real or personal estate and survives under Pub. Sts. c. 165, § 1.

In a suit in equity seeking the rescission of a contract on the ground of fraud and undue influence, the defendant has not a constitutional right to a trial by jury and can have such a trial only at the discretion of the court.

In a suit in equity seeking the rescission of a contract on the ground of fraud and undue influence, in which the transactions in dispute extended through a period of several years and the questions of fact were numerous and intricate and the accounts long and complicated, it was *held,* that the trial judge properly exercised his discretion in refusing to frame issues for a jury. HAMMOND, J., although delivering the opinion of the court, *dissenting,* on the ground, that the questions of fraud and undue influence could be separated from the questions arising upon the accounts and could be tried conveniently before a jury, and ought to be so tried if either party requested it.

In a suit in equity seeking the rescission of a contract on the ground of fraud and undue influence, involving an inquiry into transactions covering a period of several years, a master found in favor of the plaintiff, and the defendant requested the master to report the evidence on which he based his findings of fraud as to certain matters. The master reported that it would be impossible to comply with this request in the manner required, as his findings were based upon a consideration of all the facts and circumstances as developed in the whole evidence, and he therefore reported the whole evidence consisting of eight hundred printed pages of oral testimony and more than two hundred pages of exhibits, thus imposing on the court the duty of reading the whole of it. In overruling exceptions to the master's report, the court holding that the evidence warranted the findings of the master, it was *stated,* that, in view of the nature of the case and of the testimony, the course adopted by the master in reporting the whole evidence, although not usually necessary or expedient and so not to be commended as a general rule, was under the peculiar circumstances of this case reasonable and proper.

A plaintiff in a suit in equity, seeking to recover certain real and personal property of which he had been deprived by the fraud of the defendant, died testate making his widow executrix and after certain pecuniary bequests his residuary devisee and legatee. Under Pub. Sts. c. 165, § 19, the widow was admitted as a plaintiff both as executrix and in her own right. *Held,* that she was admitted

rightly. As executrix she represented the interest of her testator in the personal property claimed and the right to sell the real estate if necessary, and as residuary devisee represented all the remaining interest he had. *Held, also,* that there was no misjoinder of plaintiffs, and that by the admission of the widow in her two capacities the bill did not become multifarious.

In a suit in equity to rescind a contract and set aside conveyances and transfers obtained from an aged woman by her favorite son through fraud and undue influence when acting as her trusted adviser, there is no reason for departing from the general rule, that only the value of the property wrongly taken or withheld with simple interest by way of damages can be recovered.

In a suit in equity to rescind a contract induced by the fraud and undue influence of the defendant, and praying for a restitution of the personal property thus obtained by the defendant or its value, the plaintiff prevailed, and it then appeared that the defendant had still in his hands certain shares of stock which were part of the property in question. *Held,* that so far as possible the rescission must be entire, and that the defendant had a right to deliver these shares instead of paying their value at the time he obtained possession of them.

BILL IN EQUITY by Percy Parker, administrator with the will annexed of the estate of Elizabeth Simpson, and by Odanathus Simpson, son of Elizabeth, against Verrazano Simpson, another son of Elizabeth, alleging that the defendant had by fraud and undue influence obtained the conveyance and transfer to himself of large amounts of real and personal property belonging to the plaintiffs' testatrix, and praying, 1. For discovery, by a true statement and account under oath by the defendant of all the real and personal property transferred to him by Elizabeth. 2. That the defendant be restrained from parting with any property obtained by him from Elizabeth. 3. That the defendant be ordered to convey to Odanathus one undivided half of all the real estate conveyed to him by Elizabeth. 4. That the defendant be ordered to transfer and deliver to the plaintiff Parker, as administrator with the will annexed, all personal property received by him from Elizabeth, and to pay to the plaintiff Parker, the value of all such personal property as the defendant cannot transfer and deliver. 5. For other relief. Filed as amended August 31 and amendment allowed September 9, 1898.

The case came up on appeals by the defendant from decrees of single justices of this court, overruling his demurrers to the bill, and finding for the plaintiffs on the merits, and from various orders made in the case, and also on appeals by the plaintiffs from orders overruling their exceptions to the master's report, and on appeals of both parties from the final decree.

*W. H. Bent*, (*L. H. Kileski* with him,) for the defendant.

*F. N. Wier & G. A. Sanderson*, for the plaintiffs.

HAMMOND, J.   In this bill as finally amended, at the time of the argument before this court, the plaintiffs are Percy Parker, the administrator with the will annexed of the estate of Elizabeth Simpson, and Odonathus Simpson, one of her sons and legatees; and the defendant is Verrazano Simpson, also a son and legatee. The amount involved is several hundred thousand dollars, and the record is very voluminous, but, following pretty closely the statement of the case contained in the report of the master, we think that the nature of the controversy, including the respective contentions of the parties, may be fairly summarized as follows.

Benjamin F. Simpson, possessed of a large estate, died at an advanced age in April, 1883, and left surviving him his widow, the said Elizabeth, and the two sons who are parties to this bill. Longinus, a third son, left home when a youth, has not been heard from since 1858, and it is supposed that he never was married, and that he died in that year. The master has found that he is dead. The bulk of Benjamin's property was left to his widow as residuary legatee, and she received as such about $375,000, of which about $250,000 was in personal property. She was born in 1801 and died in 1897. During the latter part of her life she was in excellent physical condition for a woman of her age, and retained her mental capacity to the last. In May, 1884, Elizabeth surrendered to Verrazano a note which she held against him for $25,000, and took in return therefor his unsecured note for $3,000, and received no other consideration. In June, 1884, she made a will devising her property equally to her two sons. In October, 1884, she made another will giving to Odonathus her real estate, and to Verrazano her personal estate.

In June, 1887, she conveyed to Verrazano all her personal and the greater part of her real estate, and received therefor his unsecured notes to the amount of $150,000. In 1888 she, as executrix of her husband's will, executed a confirmatory assignment of some of this property.

In June, 1892, she gave up to Verrazano the notes she had received from him in 1887, as aforesaid, and substantially all

the rest of her property, and received as the consideration there-
for an agreement on his part to pay her $550 per month during
her life, and a bond conditioned to pay the absent son Longinus
$50,000, should he appear in person to claim the same within
five years from her decease. After her decease the will of
October, 1884, was presented for probate and disallowed; * and
then the will of June, 1884, was presented and allowed.

The contention of the plaintiffs is that the defendant Verra-
zano, from the time of the death of his father, was the trusted
and confidential adviser of his mother during the rest of her life;
that by reason of her age and lack of business experience, and
through her great confidence in the business capacity of the
defendant, she intrusted the care and management of her prop-
erty to him; that while he was thus acting as such adviser, he
procured the gift of May, 1884, the execution by his mother of
the will of October, 1884, and the contracts of 1887 and 1892
by means of fraud, misrepresentation and undue influence prac-
tised and exerted by him upon her; that these acts of the
defendant were done in pursuance of a general scheme and plan,
conceived and formed by him immediately after the death of his
father, to get all the property into his own hands and to defraud
Odonathus of his share; that he deceived his mother in all these
matters, especially as to the value of the property conveyed to
him in 1887 as aforesaid, — which it appears was much greater
than the consideration paid by him, — and as to the contents
and legal effect of the will of October, 1884, and the contract
of 1892; and that he concealed from her all knowledge of this
fraud, misrepresentation and undue influence, and that up to the
time of her death she never knew that he had been guilty of
such conduct before her, nor was such misconduct known to the
plaintiffs until about May 24, 1897.

The defendant denies that at any time he acted as the trusted
and confidential adviser of his mother, or that in any of the
transactions of which the plaintiffs complain he made use of any
undue influence, fraud or concealment. He avers that at the
time of each one of these transactions she was in the full posses-
sion of her mental faculties and was fully competent to transact

---

* See *Jones* v. *Simpson*, 171 Mass. 474.

the business; that in each she acted freely, voluntarily, and with full knowledge of the nature and meaning of it and of every paper connected therewith; that each transaction was wise and prudent on her part, that the result of each was fully understood and realized by her, and that to the last she was perfectly satisfied with it and never otherwise expressed herself.

As to the main issues, the master finds as follows: "That during all these years the defendant was the one person upon whose judgment Elizabeth Simpson relied in business matters; she was impressed with his business capacity and proud of his success in the accumulation of property. This capacity to accumulate, joined with an appreciation of his kindly treatment of her, and the position he had obtained in life in marked contrast to that of his brother Odonathus, had made him, in a sense, her favorite son and the more readily led her to put greater confidence in any suggestion as to business affairs which came from him, and rendered all the more easy the assumption by him and the acquiescence by her to his position of a 'trusted and confidential adviser,' upon whom she relied for advice. I find that he guided and controlled her acts with reference to her property, either personally when he was present with her, and otherwise during all these years through the men McAlvin and Jones who were in daily contact with her, in charge of his affairs, but 'all the time subject to his order and direction and at whose request and dictation she would sign such instruments as they presented to her."

The master also finds that from the death of his father the defendant was the trusted and confidential adviser of his mother until her death. He further finds in substance that all the contracts and conveyances of which the plaintiffs complain were obtained by the defendant from his mother by fraud and undue influence while he was her confidential adviser; that in this way the defendant between the death of his father and that of his mother obtained from her the bulk of her property, in pursuance of a general scheme and plan formed shortly after the death of his father, and that at no time during her life did the mother know of this fraud and undue influence. The master further finds that she never knew or understood the provisions of the will dated October 1, 1884, and that such provisions were

known to the defendant, and that in all the dealings subsequent to 1884 the defendant, acting as the confidential and trusted adviser, never informed his mother of the provisions of said will, nor called to her attention the effect that her acts would have upon the disposition of her property.

In a word, his findings sustain the allegations of the bill in these respects.

The master found for the plaintiffs, and, all exceptions to his report having been overruled, there was a decree for the plaintiffs.

During the progress of the case various amendments were made to the pleadings.

The defendant filed several demurrers to the bill, a request that issues be framed for a jury, and a motion that the master's report be recommitted, all of which were overruled, and the defendant appealed. He also filed numerous exceptions to the master's report, all of which were overruled, and he appealed, as also from the final decree. The plaintiffs filed exceptions to the report, which were overruled, and they appeal. The case is before us upon the questions raised by these several appeals. Some of them become immaterial by subsequent amendments and otherwise.

It would serve no useful purpose to go over seriatim the grounds of the various demurrers. We shall here notice only those which are insisted on in the defendant's brief, and we shall consider them topically in the order there suggested. The others call for no remark except to say that they do not seem to us sound.

1. As to discovery. The defendant insists that the plaintiffs are not entitled to the discovery sought in the first prayer, that the defendant disclose under oath a true statement and account of all the real and personal property transferred and delivered to him as aforesaid, and of the rents, proceeds and income thereof, and of all property purchased with funds so received and the income and proceeds thereof. But we do not think that he is in a position to avail himself of this contention, even if there is anything in it. The bill is for relief and not for discovery. The part of the demurrer which refers to this matter is to the whole bill. The bill is sustainable for relief. Therefore the demurrer being to the whole cannot be sustained. Story, Eq. Pl. § 312,

and cases cited in the notes. Although the rule to the master ordered, that the parties should produce before him upon oath all deeds, books, papers and writings relating to the matter, the defendant took no appeal and asked for no modification of the rule. He must be held to have acquiesced in it.

2. As to misjoinder. Nor is the bill objectionable on the ground of misjoinder of plaintiffs. The bill proceeds upon the ground of rescission, and it is plain that the contest is between the estate of the mother on the one hand and the defendant on the other. Rescission affects the whole contract. The various conveyances and transfers of real and personal estate made in June, 1887, were all parts of one and the same transaction. For them only one consideration was paid and there was no apportionment made of it between the two kinds of property. It is necessary that the recission should apply so far as practicable to the whole transaction in order that justice be done to all parties, and it is proper that those who are interested in either kind of property should be parties to the bill, so that the court may have the whole case before it, and that both the person entitled to the real estate and he who is entitled to the personal estate should be bound by the result. In this way the rights of all the parties may be adjusted and preserved in one suit. Nor is it any objection that the administrator asks for and may receive the proceeds of the real estate sold by Verrazano since 1887. It so happens that by the will of June, 1884, which has been duly admitted to probate, the estate of the mother is divided equally between her two sons Odonathus and Verrazano, subject to a provision for Longinus which becomes inoperative by reason of his death. There can be no difficulty in framing a decree in this case which will dispose of the whole case. Nor is the bill multifarious. It seeks to set aside the various contracts all being parts of one entire scheme of alleged fraud, in which all parties are interested.

3. As to the concealment by the defendant of his misconduct and its discovery by the plaintiffs. The seventh ground of the original demurrer to the amended bill was that the cause of action on account of the transaction of June, 1887, did not accrue within six years of the death of the mother or of the time of the filing of the bill, and that it did not appear from the bill that the fraud, if any, was discovered within six years before it was filed.

Whereupon the bill was amended so as to set forth in substance that the fraud was not known either to the mother during her life, or to her personal representatives or to Odonathus, until about May 24, 1897, when the defendant testified before the Probate Court at a hearing upon whether the will of October, 1884, should be admitted to probate, " at which time many of the facts herein set forth as to the confidential relations existing between said Verrazano and the said Elizabeth Simpson, and many of the undue and fraudulent influences exerted upon the said Elizabeth Simpson by the said Verrazano as herein set forth, and many of the fraudulent and untruthful representations made by him to her as herein set forth were first learned by said Odonathus and the personal representatives of the said Elizabeth Simpson from the testimony then given by the said Verrazano, and that the remaining facts of said confidential relations, undue and fraudulent inducements and influences, and fraudulent and untruthful representations have been learned from investigations made by said Odonathus and said personal representatives since the time of said hearing in the Probate Court."

The defendant contends, that, as this statement in the bill does not set forth what particular facts showing the confidential relations the fraud and undue influence were discovered before and what after the bill was filed, it does not appear that any material fact of discovery was known before the bill was brought, and so it does not appear that the plaintiffs had a cause of action at the time the bill was brought; and he seeks to apply to such a condition of things the doctrine that a bill cannot be sustained upon a new fact occurring after its filing. But the principle is not applicable. The cause of action is the fraud and undue influence under the confidential relations of the parties to the original contract. It is true that to meet the statute of limitations a fraudulent concealment of the cause of action must appear, and, if there be a cause of action and such fraudulent concealment, the action may be brought and the facts to show it may be ascertained afterwards. The discovery of the fraud and concealment is no part of the cause of action. The allegations of the bill as to the time of discovery and the facts discovered are sufficient. The master has found that the plaintiffs were

not sufficiently informed as to the defendant's acts until after the defendant's disclosure of the same in his testimony before the Probate Court, and before the Supreme Judicial Court, upon the hearing on the will of October, 1884; and we think that the evidence justifies the finding. It is immaterial that the hearing in the Supreme Judicial Court upon the will took place after the bill was filed.

4. As to rescission. As to this the defendant contends, that the contracts complained of stood until rescinded; that in case of rescission the grantor must clearly manifest his election to rescind the contract and give notice thereof to the fraudulent grantee, and also restore or tender the consideration received by him, if of any value, before he can bring an action at law; and that while in equity it may not be necessary to offer to return the consideration before bringing the bill because the court has power to impose equitable conditions upon the relief granted to the plaintiff, (*Thomas* v. *Beals*, 154 Mass. 51, 54, 55,) still, even in equity there should be a notice of rescission before the bill is brought; in other words, that there is no right of action until the grantor has determined to rescind, and at least given notice of that determination so that the grantee, if he chooses, can agree to the rescission without suit. But we are of opinion, that in a case like this the notice may be given by the bill itself. As was said in *Thomas* v. *Beals, ubi supra,* the "foundation of this bill is that the rescission is not complete, and it asks the aid of this court to make it so." The transactions involved in this suit had been of long standing, covered many different pieces of property, and, in view of the nature of the charges against the defendant and his position with reference to them, the notice to him before the suit of a decision to rescind would have been an idle ceremony. By the filing of the bill and the service he has sufficient notice. The election to rescind is sufficient for the purpose of filing the bill.

5. The cause of action survives. It is a suit in equity to recover specific property, or the avails of specific property, obtained from the person defrauded in violation of duty existing by reason of confidential relations between the defendant and his mother, and still in his hands. *Cheney* v. *Gleason*, 125 Mass. 166, 174. *Houghton* v. *Butler*, 166 Mass. 547. *Warren* v. *Para Rubber Shoe Co.* 166 Mass. 97, 104, and cases cited.

6. Before the case was sent to the master the defendant seasonably moved that issues be framed for a jury. The motion was denied, and the defendant appealed. Upon this appeal the question is fairly raised, whether the defendant has a constitutional right to a trial by jury. In support of his appeal he relies upon art. 15 of the Declaration of Rights, which reads as follows: " In all controversies concerning property, and in all suits between two or more persons, except in cases in which it has heretofore been otherways used and practised, the parties have a right to a trial by jury; and this method of procedure shall be held sacred, unless, in causes arising on the high seas, and such as relate to mariners' wages, the Legislature shall hereafter find it necessary to alter it."

This article has been called several times to the attention of this court, yet there has been no adjudication that it gives to the defendant in an ordinary suit in equity a right to a trial by jury. In some cases such a trial has been denied on the ground that the right, even if it existed, had not been seasonably demanded, and so in law was waived; *Dole* v. *Wooldredge,* 142 Mass. 161; in some, issues have been framed as a matter of discretion, *Stockbridge Iron Co.* v. *Hudson Iron Co.* 102 Mass. 45, especially where the right sought to be enforced by a proceeding in equity is essentially a common law right, *Merchants' National Bank* v. *Moulton,* 143 Mass. 543; and in some the right has been denied upon the ground that the person voluntarily invoking the aid of a court of equity must be held to have agreed to its rules of procedure, as the defendant in *Pomeroy* v. *Winship,* 12 Mass. 514, and the plaintiff in *Ross* v. *New England Ins. Co.* 120 Mass. 113, and *Bourke* v. *Callanan,* 160 Mass. 195. In other cases there are dicta which seem to indicate that the defendant has such a right. There is such a dictum by Parker, C. J., in *Charles River Bridge* v. *Warren Bridge,* 6 Pick. 376, 399, but, when the same case came before the court again, the court, speaking by the same judge, declined to adjudge that there was such a right, remarking that there was no necessity that the whole case should be put to a jury (a remark subsequently cited with approval in *Stockbridge Iron Co.* v. *Hudson Iron Co., ubi supra*), and as a matter of discretion framed issues for a jury. 7 Pick. 343, 368, 370. The opinion in that case was given the next day after the

argument, and the opening paragraph states, that the court is
brought to the consideration of this " question of high impor-
tance . . . with very little time and opportunity to give it the
attention it deserves." In neither of these two opinions was it
adjudged expressly or by necessary implication, that the defend-
ant had a constitutional right to a jury trial. In *Shaw* v. *Nor-
folk County Railroad*, 16 Gray, 407, 409, it was said in the
opinion by *Merrick*, J., that " there is no doubt that, under the
provisions of the Constitution, parties in cases in equity, as well
as at law, are entitled to a trial by jury for the determination of
all controverted questions of fact "; and in *Franklin* v. *Greene*,
2 Allen, 519, 522, which was a suit in equity, it was said in the
opinion by *Chapman*, J., that " in this Commonwealth the right of
trial by jury is secured by the constitution." But in *Stockbridge
Iron Co.* v. *Hudson Iron Co.*, *ubi supra*, Chapman, C. J., in giving
the opinion of the court, declared that the dictum in the first of
these two cases " was an unguarded concession not required by
the case; for a trial by jury was there refused," and that in the
second case " it was not decided . . . that a party to a suit in
equity is in all cases entitled to a trial by jury"; and then, after
saying that a plaintiff in equity "never had the absolute right of
trial by jury" (a point afterwards so adjudged in *Ross* v. *New
England Ins. Co.*, *ubi supra*), he proceeds to state that in the case
before him issues may be framed at the discretion of the court.
There were two cases before the court, in one of which the
Stockbridge Company was the plaintiff and the Hudson Com-
pany the defendant, and in the other, a cross bill, the parties
were reversed. The motion was made by the Hudson Iron
Company in both cases.

In *Powers* v. *Raymond*, 137 Mass. 483, the suit was of a nature
unknown to general equity jurisprudence, and, although it was
in the form of equity, it was said that the remedy sought was
substantially the common law remedy. The case before us
seems to call for a decision of the question, whether the defend-
ant in a case like this has a constitutional right to a trial by
jury.

The case is certainly a controversy concerning property. The
final decree, from which the defendant appeals, directs him to
pay to one of the plaintiffs more than half a million dollars in

all, and also to convey to the other an undivided half of certain real estate worth some thousands of dollars. Material facts are in dispute. The plaintiffs allege, that the defendant was the confidential agent and adviser of his mother; that while he sustained that relation to her he obtained from her the property in question by means of fraud and undue influence practised by him upon her. All this the defendant denies; and the case as to liability turns upon the decision as to these questions of fact. It is clear that upon such questions, in a case at common law, the defendant would have a constitutional right to a trial by jury. And it is equally clear that under the general principles of equity practice in England, and in the Federal courts, and also (in the absence of any constitutional provision to the contrary) in the various State courts, the defendant would not be entitled as of right to a jury, but could have such a trial only at the discretion of the court.

It is necessary to review to some extent the judicial history of the colonial and provincial periods. So far as respects the colonial period, the General Court provided for by the Charter of Charles I., which was primarily a charter for a trading corporation, (see *Peters* v. *Peters,* 8 Cush. 529, 540,) exercised very extensive judicial powers as to questions both of common law and equity, and granted the appropriate relief. See Anc. Chart. 88, § 1. In that court there was no trial by jury. Very early, however, the need of a better system both for the relief of the court and the protection of litigants was apparent, and from the necessity of the case, as well as by the authority conferred in the broad and general terms of the charter, inferior courts were established. St. 1639, Anc. Chart. 90, 91. *Peters* v. *Peters, ubi supra,* at pp. 536, 537. Even after the establishment of these courts, however, the general court retained appellate and even original jurisdiction in some cases, although from time to time statutes were passed to discourage litigants from applying to it. See the statutes cited in Washburn's Judicial Hist. of Mass. 27. There can be no doubt, however, that during the whole colonial period this court exercised a kind of original chancery jurisdiction. In 1685 a statute was passed conferring upon certain courts chancery powers subordinate to the General Court. Washburn, 28. Anc. Chart. 93, 94. 4 Mass. Col. Rec.

pt. II, 292.  See also the authorities and cases cited in an in-
structive note to Quincy's reports, 537, note 54.  The pream-
ble to the statute of 1685 is very significant as to prior practice.
It is as follows: " Whereas it is found by experience, that, in
many cases and controversies betwixt parties wherein there is
matter of apparent equity, there hath been no way provided for
relief against the rigor of the common law but by application to
the General Court, where, by reason of the weighty affairs of
the country of more public concernment, particular persons have
been delayed, to their no small trouble and charge, and also great
expense occasioned to the public by the long attendance of so
many persons as that Court consists of, to hear and determine
personal causes brought before them, for ease and redress where-
of, it is ordered and enacted " etc.  5 Mass. Col. Rec. 477.  The
purpose of this statute was to establish a general court of chan-
cery jurisdiction as then existing in England, and to transfer to
it such matters of that kind as theretofore had been heard in
the General Court.  This statute was passed just before the dis-
solution of the charter was known to the colony, and it does not
appear that the court ever was organized, but it shows the view
of the people of the time as to the propriety and desirability of
such a tribunal as the successor to the General Court in this part
of its judicial business.

During the time intervening between the notice to the colony
of the cancellation of the first charter and the reception of the
provincial charter in 1692, there was no change in the judiciary
system which we need to notice.  While it is true that in the
royal commission to Andros of June 3, 1686, there was given to
him full authority with the advice and consent of his council to
establish courts of common law and chancery (see the commis-
sion set out in full in 7 Mass. Hist. Society's publications, 3d
series, 139), and that in accordance with the power thus conferred
a resolution was taken by him on March 3, 1687, by and with
the advice and consent of the council to establish among others
a court of chancery, still, even if the court was actually put in
operation, a matter we have not been able to verify, such an act
at such a period would not be deemed of consequence in this
discussion.  (For this act see Washburn, 96, and Col. Rec. of
Conn., 1678 to 1689, p. 411.)  The provincial charter, however,

worked a great change. All judicial power was taken from the General Court, and it became a legislative body only. The Governor and Assistants were made a court of probate, and the General Court was authorized to "erect and constitute judicatories and courts of record, or other courts," to be held in the king's name, "for the hearing, trying and determining of all manner of crimes, offences, pleas, processes, plaints, actions, matters, causes and things whatsoever, arising or happening within our said province or territory; or between persons inhabiting or residing there; whether the same be criminal or civil." Anc. Chart. 31, 32. The language of the charter, it will be noticed, is very broad, and coming from an English king to his English subjects it must be held to have granted the power to establish here courts having like jurisdiction and methods of procedure as in England, both at common law and in equity.

The General Court having first reaffirmed, by an act which was subsequently disallowed by the king, some of the leading principles of Magna Charta, including the common law right of a trial by jury, (Anc. Chart. 214; Prov. St. 1692–93, c. 11, 1 Prov. Laws (State ed.) 40, and note on p. 41,) proceeded to act under the authority granted in the charter to establish courts, and passed the Prov. St. of 1692–93, c. 33, 1 Prov. Laws (State ed.) 72. This statute provides in the first nine sections for the establishment of several courts of common law jurisdiction; in the tenth section, "That all matters and issues in fact arising or happening within the said province, shall be tryed by twelve good and lawful men of the neighbourhood"; and prescribes in the eleventh, twelfth and thirteenth sections the manner in which the jury shall be summoned and for the matters of procedure in the "said courts." Having provided thus for the enforcement and regulation of the civil and criminal matters belonging to courts of common law jurisdiction, and declared the right of trial by jury therein, it proceeds in the fourteenth·section to provide for the establishment of "a high court of chancery," which shall have power and authority "to hear and determine all matters of equity, of what nature, kind or quality soever, and all controversies, disputes and differences arising betwixt co-executors, and other matters proper and cognizeable to said court, not relievable by common law; the said court to be holden . . .

by the governour, or such other as he shall appoint to be chancellor, assisted with eight or more of the council," and at such times and places as the governor or chancellor should appoint. In a word, this statute provided for the establishment of courts of common law with the right of trial by jury therein, and also a chancery court with full jurisdiction, in which there was no such trial, thus conforming to the general system of jurisprudence in the mother country. A subsequent statute somewhat more specific in language was passed with reference to this court of chancery alone. It provided, that instead of the governor and assistants the court should be held by three commissioners, assisted by five "masters in chancery," all to be appointed by the governor with the consent of the council. Anc. Chart. 274, 275. Prov. St. 1693–94, c. 12, 1 Prov. Laws (State ed.) 144. Both of these statutes, however, failed to receive the approbation of the king, and as early as December, 1696, they were disallowed in accordance with the power reserved in the charter, (Anc. Chart. 34, 1 Prov. Laws, State ed. 17,) the only ground of their rejection being that their provisions with reference to the appeal to the king in council, being too limited, were not "according to the words of the charter." See notes to these acts, Prov. Sts. 1692–3, c. 33; 1693–4, c. 12; 1 Prov. Laws (State ed.) 76, 145. This action of the crown therefore did not proceed upon the ground that the colonists had not the right to establish a court of chancery. That right was directly granted by the charter, as we have seen, and was acted upon by the General Court. Soon after the passage of the first statute, justices of the common law courts were appointed, and they held courts until notice was received of the disallowance of the statute. But it does not appear that under either of the two statutes any court of chancery was established, or even that commissioners or masters in chancery ever were appointed under the second statute. 6 Dane Abr. 405. See also the records of the governor and council 1692–98. Subsequently acts were passed establishing substantially the same system of courts, except that no act providing for a court of chancery was ever afterwards passed during the provincial period. Certain limited chancery powers were, however, delegated to the common law courts, such as chancering the penalty of bonds, rendering conditional judgments in suits

on mortgages and providing for the redemption of mortgaged estates after condition broken. See Anc. Chart. 324, 329, 330; Prov. Sts. 1698, c. 22; 1699–1700, c. 2; 1 Prov. Laws (State ed.) 356, 369; Washburn, 158. But in all these cases the question of liability, if disputed, was to be settled by a jury. Anc. Chart. 324. Prov. St. 1698, c. 22, 1 Prov. Laws (State ed.) 356.

Prior to the provincial charter, cases in admiralty were heard by the Court of Assistants without a jury; 4 Mass. Col. Rec. 575; Anc. Chart. 721, § 30; Washburn, 30, 68; although they seem to have summoned juries at times in such cases and to have given judgment and execution as at common law; the distinction between the procedure in admiralty and that at common law being apparently disregarded by the court. Under the provincial charter, the power of establishing admiralty courts was reserved to the crown, and, in 1694, Governor Phipps having meanwhile exercised whatever admiralty jurisdiction there was, such courts were established by the crown, in which there was no trial by jury. Washburn, 172, 173. After the beginning of the revolutionary struggle, courts of admiralty were established by the province, having jurisdiction over the condemnation of vessels taken in war and otherwise subject to capture, and over the claims of seamen for wages and salvage. Disputed questions of fact were to be settled by a jury, and appeal from any decree or order was granted to a State court, or to the Continental Congress, or to persons appointed by it to hear such appeals. Prov. Sts. 1775–76, cc. 7, 15, 19, 27, 5 Prov. Laws (State ed.) 436–439, 464–467, 474–477, 503; 1777–78, c. 33, 5 Prov. Laws (State ed.) 806, 807; 1779–80, c. 10, 5 Prov. Laws (State ed.) 1077.

The result shown is that, although during the existence of the first charter the General Court exercised a kind of chancery jurisdiction, which, however, was too vague and indefinite to be of much weight in the consideration of the question before us, and although up to the time of the adoption of the Constitution the common law courts were given certain powers to chancer bonds and to relieve against the foreclosure of mortgages, there never was in actual operation in the colony or province a court of chancery. It is true, as above stated, that two statutes were passed to establish such a court, but both became inoperative

through the action of the crown. There were courts of common law jurisdiction in which trials were had by jury, except as to some questions which were tried without a jury. *Mountfort* v. *Hall,* 1 Mass. 443. *Shirley* v. *Lunenburg,* 11 Mass. 379. There was also a trial by jury in the admiralty courts established by the province just prior to the Constitution. But in probate and divorce courts there was no such trial. There were also courts held by one or more magistrates without a jury, for the trial of small causes where the damages sought to be recovered did not exceed forty shillings. These courts seem to have been in existence as early as 1650, and such courts continued all through the subsequent colonial and provincial periods. There was a right of appeal from the judgment of such a court to a higher court. Anc. Chart. 45, 47, 48, 66, 67. Prov. St. 1692–93, c. 33, § 1, 1 Prov. Laws (State ed.) 72. 6 Dane Abr. c. 188. See also in last named work, c. 187, arts. 9 and 10.

With this judicial history behind them, the constitutional convention received from the pen of John Adams, to whom, through a committee, the task of writing the Declaration of Rights had been assigned, the article under consideration. As thus received, it did not contain the words "except in cases in which it has heretofore been otherways used and practised," but in all other respects it was as it now stands in the Declaration of Rights. Journal Mass. Convention of 1779–80, pp. 24–31, 35, 195. 4 John Adams's Life and Works, 215, 216.

The article seems to have received from the convention consideration commensurate with its importance. Although reported in October, 1779, it was referred after discussion to another committee for amendment, who, after stating several times that they were not ready to report, finally reported in the latter part of February, 1780, the article as it now stands, and it was adopted by the convention. Journal Mass. Convention of 1779–80, pp. 38, 39, 41, 48, 95, 152. At that time the colonies were engaged in the struggle for independence. They had repudiated the old government, and they were about to establish a new one. Our ancestors were English subjects, and as such brought with them to this country the general principles of English law, so far as applicable to their situation. In England there were two general systems of jurisprudence working side

by side, not inconsistent with each other, but each necessary to the full enjoyment of English liberty. In one there was an absolute right to trial by jury, in the other the right to such a trial was at the discretion of the court. Our ancestors brought the rights equitable as well as legal. The right to the reformation of a written contract, to the cancellation of a fraudulent deed, or to an injunction against irreparable injury to property was as much theirs potentially as was the right to an action to recover damages for breach of contract, to a writ of entry to recover land obtained by fraud, or to an action of trespass; and that was so whether or not a court of chancery was established. Such a court, if established, would not have created those rights, but it simply would have furnished a tribunal for their enforcement, and they would have been enforced in accordance with chancery practice.

It is to be remembered, that we are dealing with a general principle set forth in the Declaration of Rights: "In construing this Constitution, it must never be forgotten, that it was not in-- tended to contain a detailed system of practical rules, for the regulation of the government or people in after times; but that it was rather intended, after an organization of the government, and distributing the executive, legislative and judicial powers amongst its several departments, to declare a few broad, general, fundamental principles, for their guidance and general direction. Another general consideration is perhaps not of less importance in understanding the genius and spirit of our Constitution, and it is this; that this declaration of rights, and frame of government, composing together the Constitution, was not first prepared and drawn up by and for a people who were then, for the first time, establishing political and civil institutions, for their security and government; it was rather a slight remodelling of a social system, by a people who had long enjoyed the protection of law, and the security of social order, under a government, nearly as free, and practically nearly as popular, as the lot of humanity would admit. The Constitution itself recognizes this condition of law and social order, and provides that all laws, before adopted, used and approved, in the Colony, Province or State, should remain and continue in force, such parts only excepted, as were repugnant to the rights and liberties contained in the

Constitution itself.   Each particular clause and provision of
the Constitution therefore, and especially in the declaration of
rights, is to be expounded under the broad light thrown upon
it by this constant reference, tacit or express, to established laws
and institutions, and to the principles and maxims of civil
liberty, secured and regulated by mild, equal and efficient
laws." Shaw, C. J., in *Commonwealth v. Blackington*, 24 Pick.
352, 356.

In speaking of the right of jury trial, Blackstone and the
writers before him, whether the language be in charter, case or
text book, are speaking of the right at common law, and are to
be so understood.   They are not speaking of the manner in
which courts of chancery may exercise their jurisdiction.   And,
when Adams wrote this article in the Declaration of Rights, he
was upon the same subject and must be understood in the same
way.   He could not have meant, that a trial by jury should be
allowed in every controversy concerning property or in every
suit between two or more parties, as, for instance, in all matters
of probate.   The article as reported by him was a general dec-
laration of the constitutional right under the English law to a
trial by jury in civil cases, and was intended to secure to the
people under the State government the same rights to which
they had been theretofore entitled as subjects of the crown.
But Adams remembered that while there was no right to a trial
by jury in the admiralty courts of England, yet in the recent
provincial legislation hereinbefore referred to, establishing courts
of admiralty here, there was a right to such trial.   Hence the
concluding clause as to the right to make a change in that
respect so as to conform to the English admiralty practice.   The
causes of the separation between the colonies and the mother
country are not to be found in the dissatisfaction of the people
of the former with the ordinary and usual administration of the
English law, but in the usurpations of the crown and its officers.
They were not only satisfied with their rights as Englishmen,
but they insisted upon having them.   This position is well and
authoritatively set forth in the statement in the Declaration of
Rights made by the Continental Congress of 1774, in which
among other things it was declared, that our ancestors who set-
tled this country were at the time of their emigration from the

mother country entitled to all the rights of Englishmen and brought them with them to this country, and that "the respective colonies are entitled to the common law of England, and more especially to the great and inestimable privilege of being tried by their peers of the vicinage, according to the course of that law." Journals Mass. Prov. Cong. 734. It may be incidentally noted also in this connection that among the amendments proposed by Massachusetts in adopting the Constitution of the United States was the following: "In civil actions between citizens of different States, every issue of fact arising in actions at common law, shall be tried by a jury, if the parties, or either of them, request it." Journal Mass. Convention of 1788, p. 80.

The interpretation of the article as thus originally reported makes the constitutional right to a trial by jury conform to the same right as it existed under the law of England. The article, however, was not passed as reported. After much delay, it was amended by an excepting clause, and in 6 Dane Abr. 443, the following statement is made as to the reasons for the amendment: " Prior to the adoption of our State constitution, in the year 1780, as is seen in the next preceding chapter, certain causes under 40s. value, debt and trespass, had ever been tried in certain inferior courts, without any jury, but always with an appeal to either party to a court having a jury; and on every such appeal the cause was tried, as fully, and to all intents, as it would have been if there had been no such former trial of it; and, as will be observed on the appeal, every party has had the benefit of any new evidence, and new plea also; therefore, when the 15th article in the bill of rights, annexed to this constitution, was adopted, it was well understood what was meant by that article, which provided, 'that in all controversies concerning property, and in all suits between two or more persons, except in cases in which it has heretofore been otherwise used and practised, the parties have a right to a trial by jury, and this method of procedure shall be held sacred, unless in causes arising on the high seas, and such as relate to mariner's wages, the legislature shall hereafter find it necessary to alter it'; that is, this trial by jury had been used and practised in all causes at common law, above 40s. value in the first instance, and under that

value on an appeal, and this article provided that this usage and practice should be continued." Whether this statement and explanation be correct in all respects we need not determine. That there were classes of cases which were here tried without a jury before the establishment of the Constitution is certain. See *Mountfort* v. *Hall*, and *Shirley* v. *Lunenburg, ubi supra*, for instances in addition to those hereinbefore alluded to.

The article as it now stands is a declaration of the common law right to a trial by jury, and in no way is inconsistent with the establishment of a court of chancery having general jurisdiction, as it was at the time of the adoption of the Constitution, and proceeding in accordance with its fundamental rules of practice as then existing. One of these rules was that trial by jury should be at the discretion of the court. The case before us is one of alleged fraud and undue influence, in which the plaintiffs among other things ask that the defendant be ordered to account for and to deliver to the plaintiffs personal property and real estate which he wrongfully obtained. Both as to subject matter and the remedy sought, the case is well within chancery jurisdiction, as it existed at the time of the adoption of the Constitution and had for a long time theretofore existed. It follows, that the defendant has not a constitutional right to a trial by jury, and that he can have such a trial only at the discretion of the court.

Upon the question whether in the exercise of such discretion there should be a trial by jury upon any of the questions in the case, I am not in accord with the majority of the court. It is urged by the plaintiffs that the transactions in dispute extend through so long a period of years, the questions of fact are so numerous and intricate, the documentary evidence is so great and the accounts are so lengthy and complicated, it would be impossible for a jury, under the conditions necessarily incident to a jury trial, to master the case and do justice to the parties. There is much truth in the plaintiffs' description of the nature of the case. The exhibits number considerably more than one hundred and make a volume of more than two hundred pages; the evidence before the master fills nearly eight hundred pages, and the accounts are so voluminous that no one would think of sending them in the first instance to a jury for

settlement. There are also at least three large and important contracts in question, and the evidence must cover a period of at least fifteen years. Moreover in his first request for a jury the defendant submitted seventeen issues, in his second thirteen more, and in his third still fifteen more, making forty-five in all. Subsequently, in place of all these, he submitted only twenty-three issues. Nevertheless, speaking for myself alone, I think that the crucial questions of fraud and undue influence at least could be easily separated from the questions arising upon the accounts and could be conveniently tried before a jury, and that they ought to be so tried if either party requests it.

The majority of the court, however, think that under the circumstances the order overruling the motion for a jury trial should be affirmed.

7. We now proceed to the questions raised by the defendant upon the master's report which have not been heretofore considered.

In his first exception to the master's report the defendant complains that the master did not report his findings of fact upon certain specific matters as he was requested to do by the defendant. These requests are to be found in the forty-four requests made by the defendant at the time of the hearing, and in the seventy-nine suggestions for alterations of the report and in the objections to the report. In substance the defendant requested the master to state the facts which form the basis of his findings stated in the report. So far as respects the requests made at the time of the hearing, the master has generally stated his findings, some of which are favorable and some unfavorable to the defendant. It appears however that the master has not in all respects reported the subordinate facts with the particularity requested by the defendant. Upon a careful examination of the report, however, we think that the defendant has no just cause for complaint. The master has stated the facts upon the finding of which the decision of the cause must turn, and he has sufficiently stated the subordinate facts which form the basis of these findings. The process of subdivision must stop somewhere, and we think that the master has carried it as far as a reasonable construction of the rule under which he acted or justice to the parties requires.

As to many of the facts in dispute, and particularly with reference to the question of confidential relations between the defendant and his mother and the various contracts which the plaintiffs seek to avoid, the defendant requested the master to report the evidence upon which he bases his findings of fraud. The master reports in substance that it would be impossible to comply with this request in the manner required; that his findings are based upon a consideration of all the facts and circumstances as developed in the whole evidence, and that if called upon to specify the particular evidence which bears upon each fact or finding, his " report would be a duplication and reduplication of the evidence," and he therefore reports the whole evidence. It consists as has already been said of eight hundred pages of oral testimony and more than two hundred pages of exhibits; and this manner of reporting has imposed upon the court the duty of reading the whole of it.

The case is peculiar in many respects. It involves an inquiry into transactions covering a period of several years, and from one of the parties to the contract there is no direct testimony. Upon reading the testimony we can well see how the mind of the master was influenced by a consideration of it as a whole, and that there is a general relation of mutual support among the parts, which cannot be seen and appreciated except by a reading of the whole. In view, therefore, of the nature of the case and of the testimony, the course adopted by the master, although not usually necessary or expedient and so not to be commended as a general rule, was, under the peculiar circumstances of the case, reasonable and proper, inasmuch as it tended to place the court in a better position to judge concerning the correctness of his conclusions than if he had pursued a different course.

During the hearing before the master the defendant took numerous exceptions. Upon an examination of them we do not see that any error prejudicial to the defendant was made.

The defendant strongly objects, that the evidence does not warrant the findings of the master as to fraud, undue influence and confidential relations as to any of the transactions in dispute, especially that of the alleged gift of $22,000 in May, 1884; and he contends still further that on several of the items charged against him by the master there is no evidence to sup-

port the charge. It will serve no useful purpose to go into the evidence in detail. We are satisfied with the finding of the master both as to the general features of the case and the particular items of the report. The essential features of the case as disclosed in the testimony stand out clear and distinct, and amply warrant the conclusions to which he came. The defendant's exceptions to the master's report should be overruled.

8. Since the argument before the full court, the plaintiff Odonathus Simpson has died, testate, leaving issue and also a widow, Esther P. Simpson, who has been duly appointed executrix of his will. By the terms of the will, after several pecuniary bequests to various persons, the widow is made the residuary devisee. In her capacity as executrix she represents all the interest which Odonathus had in this case, so far as respects personal estate and the right to sell real estate if necessary for the settlement of his estate, and in her capacity as residuary devisee she represents all the remaining interest which he had. She is both executrix and residuary legatee, and whatever necessity there may have been formerly for a bill of revivor, (*Pingree* v. *Coffin*, 12 Gray, 288,) there is none now under our present statutes. Pub. Sts. c. 165, § 19. *Cheney* v. *Gleason*, 125 Mass. 166. She was rightly admitted as a party to take the place of the deceased plaintiff. There is no misjoinder for reasons hereinbefore stated in the first part of this opinion, nor does the bill thereby become multifarious. She is interested both in her individual and representative capacity in the controversy, although she does not in either capacity share in its whole fruits. The whole controversy, as has been hereinbefore said, can and should be settled in one suit, and there is no difficulty in adjusting the decree to the circumstances.

9. As to the question of interest. This question has been elaborately argued by the counsel on each side, the plaintiff insisting that compound interest should be allowed; but we think that only simple interest should be allowed. The case proceeds upon the ground of rescission, and there is nothing to take it out of the general rule that in actions at law or suits in equity seeking to recover the value of property wrongfully taken or withheld, the value of the property at the time of the taking, with simple interest by way of damages, is the extent of the

liability. *Stearns* v. *Brown*, 1 Pick. 530. *Hodgkins* v. *Price*, 141 Mass. 162, 164. *Forbes* v. *Allen*, 166 Mass. 569.

10. As to the plaintiffs' exceptions to the master's report, the first related to an oversight on the part of the master, and is sustained. As it relates simply to the interest upon the $22,000 gift, it was corrected in the decree and may be corrected in the final decree, and no further action will be necessary. The other exceptions are overruled. Notwithstanding the vigorous argument of the counsel to the contrary, we are satisfied with the finding of the master and with the method of computation adopted by him.

11. There remain to be considered the questions connected with the final decree. The decree entered by the single justice, from which both parties appeal, after overruling all the exceptions taken by the plaintiffs and by the defendant to the master's report, declared certain contracts and conveyances to be void, including two deeds, all being particularly described either by reference to the bill or otherwise, and ordered that the defendant convey to Odonathus one undivided half interest in each of the parcels of real estate described in the two deeds, and that he pay to the plaintiff Parker a certain sum of money ; and further ordered that the defendant pay the plaintiff Odonathus Simpson the sum of $600 with interest, and that the plaintiffs recover costs.

The defendant contends that the administrator is not entitled to the proceeds of the sales of real estate made in the lifetime of his mother, and in support of that contention he says that upon rescission, as between the administrator and the heirs, the conversion of the real estate into cash by the fraudulent grantee does not change its character, but that it still would remain real estate. There can be no doubt that so far as respects the respective rights of the administrator and the heirs, the proceeds of such real estate sold would be regarded, as between them, as real estate in the final distribution ; but as between the estate of the grantor and the fraudulent grantee such real estate in the possession of innocent third parties cannot be recovered. The only thing remaining is a right of action for money, and there is no reason why the administrator cannot proceed to enforce this chose in action. When he recovers he will hold the proceeds in

trust for the person to whom the real estate if unsold would have gone.

In this case it is absolutely immaterial whether it be regarded as personal or real estate, since under the will which has finally been allowed the property both real and personal is divided equally between the defendant and his brother.

The prayer of the bill, as finally amended, in substance is that the defendant be ordered to deliver to the administrator the personal property he received, so far as he can, and the value and proceeds of any personal property which he cannot transfer in kind, and also the proceeds of real estate sold by him, and that " he make to the administrator . . . such other restitution and compensation in damages as the administrator . . . is entitled to recover."

The bill proceeds upon rescission, and the defendant is right in saying that so far as possible the rescission must be entire. These transactions are all part of one scheme, and the plaintiffs cannot elect to rescind in part and affirm in part. At the hearing before the master it appeared that certain property still remained in the hands of the defendant. The defendant asked that if a decree was to be made against him he should have the right to deliver up certain stocks which he particularly specified and be credited therefor the amounts charged against him on account of those particular articles. We think that he is right, and that as to those articles which he thus specified the decree should be so modified as to order him to deliver them up. In default thereof he is to pay for them the value which was charged against him.

The death of Odonathus and the appearance of his executrix and residuary legatee makes it necessary to change the decree so far as it orders any conveyance or payment to him. The undivided half of the real estate which was to be conveyed to him should be conveyed to his residuary devisee to hold the same in fee subject, however, to the claims of the creditors or other devisees of his estate as though he had died actually seised. Of course the decree is to be so framed as to show that the remaining half is to remain in the defendant. The $600 to be paid to Odonathus should be paid to his executrix as such. With these modifications the decree is to stand.

The result is that the various orders overruling the demurrers; the order refusing to frame issues for a jury; the order refusing to recommit the master's report; the order allowing extracts from the argument of the counsel for the plaintiffs at the hearing before the master to be printed in the record, concerning which the defendant has said nothing in his brief; the order allowing the amendment of October 27, 1900, and the order allowing Esther P. Simpson, in her individual capacity as residuary legatee under the will of her late husband Odonathus Simpson and as the executrix of his will, to become a party plaintiff, as well as the order overruling the demurrer to the bill as thus amended by her appearance, are all severally affirmed. The exceptions filed by the defendant and by the plaintiffs to the master's report are all overruled, except the first filed by the plaintiffs, which is sustained and the correction made in the decree on that account is to remain. The final decree is to be modified in accordance with this opinion.

*So ordered.*